875 So.2d 37 (2004)
STATE of Louisiana
v.
Dan BRIGHT.
Nos. 2002-KP-2793, 2003-KP-2796.
Supreme Court of Louisiana.
May 25, 2004.
*38 Emily M. Bolton, G. Benjamin Cohen, Clive Adrian Stafford Smith, New Orleans, Counsel for Applicant.
Charles C. Foti, Jr., Attorney General, Eddie J. Jordan, Jr., District Atty., Battle Bell, IV, Valentin M. Solino, Counsel for Respondent.
Sarah L. Ottinger, New Orleans, Counsel for amicus curiae Kathleen H. Norman.
Lawrence C. Marshall, Stephen I. Singer, Counsel for amicus curiae Innocence Network.
Robert S. Glass, Timothy A. Meche, New Orleans, for amicus curiae Louisiana Association/Criminal Defense I.
Robert S. Glass, New Orleans, Virginia Sloan, Covington, for amicus curiae The Constitution Project.
WEIMER, Justice.
On application of defendant, Dan L. Bright, who is serving a life sentence for *39 second degree murder, we granted a writ solely to determine whether the State suppressed material evidence regarding the criminal history of the prosecution's key witness, Freddie Thompson, and, if so, whether defendant is entitled to a new trial. Based on the particular circumstances surrounding the fatal shooting, which include the fact there was no physical evidence, and the nature of Thompson's testimony, which is the only evidence that served to convict, we resolve this factspecific issue reversing the conviction, vacating the sentence, and remanding for a new trial.

PROCEDURAL HISTORY
In 1996, an Orleans Parish jury found the defendant, Dan L. Bright, guilty of first degree murder. In accord with the jury's determination, the court imposed a sentence of death. On appeal, this court found the evidence insufficient to support the conviction of first degree murder and rendered a judgment of guilty of second degree murder. State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134. The trial court subsequently imposed a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
In 2000, defendant filed an application for post-conviction relief, which the district court denied. The court of appeal denied writs, State v. Bright, 02-1276 (La.App. 4 Cir. 10/17/02), and defendant filed the first of two applications in this court. Meanwhile, defendant filed pleadings in federal district court seeking production of Federal Bureau of Investigation (FBI) materials pertaining to the investigation of the crime for which he was convicted.[1] In March 2003, the federal district court granted relief and ordered the material produced.[2] Shortly thereafter, in light of the availability of the FBI material and in response to a motion by defendant, this court issued an order allowing him to reopen proceedings in the Criminal District Court for Orleans Parish. That court denied defendant postconviction relief, and the court of appeal denied writs. State v. Bright, 03-1238 (La.App. 4 Cir. 9/9/03). The second of defendant's two applications followed.
Although defendant made five claims in his application, we granted a writ to consider the sole issue of whether the State suppressed material evidence as defendant alleges and, if so, whether defendant is entitled to a new trial.

FACTS
The defendant was convicted of and sentenced for the killing of Murray Barnes on January 29, 1995, which was Super Bowl Sunday. After the football game that evening, Barnes parked his truck directly across from Creola's Bar located at 2904 Laussat Street, between Press and Montegut Streets in New Orleans, Louisiana. He was accompanied by his friend Kevin *40 Singleton and his cousin Freddie Thompson, who remained in the truck while Barnes and Singleton entered the bar. Upon entering Creola's Bar, Barnes discovered he had won $1,000.00 in the bar's football pool. The barmaid handed him his winnings in two envelopes, each containing $500.00. In apparent good humor, Barnes tipped the barmaid and treated his friends to a round of drinks.
To put the issue before us in perspective, we repeat the narrative of facts from our previous opinion.
As Thompson waited in the truck, he noticed a woman and two men conversing at the corner of Laussat and Montegut, on the same side of the street as Creola's, about a half block away. As Thompson watched, the two men moved to the middle of Laussat Street and began walking in his direction. They walked as far as Creola's, then turned around and retraced their steps to the corner. Thompson observed that both men wore sweat suits with hoods, one grey and one blue. When the man dressed in grey passed nearer to the truck, Thompson made eye contact with him. About the time that the men returned to the corner, Singleton opened the front door of the bar and yelled to Thompson that Barnes had won and to come in for a drink. As Thompson was walking towards the bar, the woman who had been conversing at the corner with the two men approached Thompson and asked that he tell the driver of the truck that she wanted to see him. Thompson ignored her and proceeded to the bar. Inside the small establishment, Thompson saw the woman again. She had come in behind him, walked slowly around the room, and then left. Thompson thought it odd that she did not speak to Barnes, since she had just told Thompson to tell Barnes that she wanted to talk with him.
Shortly thereafter, Barnes, Thompson, and Singleton left the bar and walked to the truck. Thompson was entering the passenger side when he spotted the woman on Laussat on the other side of Montegut, walking away. He directed his cousin's attention to her. Barnes looked and shouted, "Hey, Chris." The woman paused, looked back, but then turned around and resumed walking away. Barnes continued around back of the vehicle to the driver's side. Thompson and Singleton were in the cab of the vehicle and Barnes was about to open the driver's door when the two men ran out of an alley and confronted him on the sidewalk.
Thompson recognized the assailants as the same two men he had seen earlier at the corner and walking in the middle of Laussat. The one in grey held a gun in his right hand. Just before the gunman started firing, Thompson heard Barnes exclaim, "What?" Singleton heard the gunman say one unintelligible word, to which Barnes replied, "What's up with that?" The gunman fired his weapon and shot Barnes, who then ran around the back of his truck toward Creola's and entered the bar through a side door. Thompson and Singleton, who were unharmed, ran after him. When Barnes ran toward the rear of his truck, the assailants took off in the opposite direction toward Montegut Street and turned right on to Montegut. As the assailants reached the corner, they fired two more shots in the air. Inside the bar, Barnes told the barmaid that he had been shot and to call the police. Barnes then collapsed.
Thompson and Singleton left the scene in the victim's truck to alert family *41 members.[[3]] As a result, police parked in the spot where the victim's truck had been at the time of the shooting. The first officers to arrive found the victim on his back on the floor of the bar, unconscious. Thompson and Singleton returned with Barnes's aunt in time to see Barnes being carried out of the bar on a stretcher. They remained on the scene and gave statements to investigators. Thompson stated he could identify the shooter, as well as the woman. He described the shooter as 5'6" or 5'7" tall, light-skinned, weighing 140 pounds, and wearing a grey sweat suit with a hood. Singleton told police that he doubted he could identify anyone.
Barnes was shot three times. Two bullets hit his back in the upper torso region, and the third struck the back of his left arm. One bullet punctured a lung and ruptured an artery, precipitating substantial internal bleeding, unconsciousness, and ultimately death. Based on the trajectory of the bullets in Barnes's body, the forensic pathologist who performed the autopsy stated that the wounds were consistent with a righthanded shooter[[4]] standing behind the victim and slightly to the victim's right.
Bright, 98-0398 at 3-5, 776 So.2d at 1137-1138.
An investigation produced only one of the two envelopes of Barnes's winnings, and that envelope contained $440.00. This court has noted that the evidence at defendant's trial did not foreclose the possibility that someone other than the two assailants took the missing envelope from Barnes either before or after the wounded and dying man reentered the bar. Bright, 98-0398 at 12, 776 So.2d at 1142. The murder weapon was never recovered. Although initially there were no leads as to the perpetrator's identity, a New Orleans police detective eventually received information implicating Dan Bright, Christina Davis, and her cousin, Tracey Davis. The detective compiled photographic arrays and displayed them to Thompson, who identified the defendant Bright as the shooter and Christina Davis as the woman who had spoken to him shortly before the shooting. He could not identify Tracey Davis. Christina Davis was arrested on February 20, 1995; the defendant surrendered to police on March 8, 1995.

DISCUSSION
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that suppression by the prosecution of evidence favorable to the accused after receiving a request for the evidence violates a defendant's due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. For purposes of the State's due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence. State v. Kemp, 00-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); State v. Knapper, 579 So.2d 956, 959 (La. 1991).
*42 Nevertheless, it is important to note that Brady and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the "omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). For purposes of Brady's due process rule, a reviewing court determining materiality must ascertain:
not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. [Emphasis supplied.]
Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). See also, State v. Strickland, 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the "evidentiary suppression `undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).
At defendant's trial, the State presented the testimony of the two men who were with the victim at the time of the shooting. Thompson, who had identified defendant and Christina Davis from a photographic line-up several weeks after the shooting, testified concerning the defendant's identity as the shooter. Singleton described what occurred but could not identify anyone. Bright, 98-0398 at 3-8, 776 So.2d at 1137-40.
In support of an alibi defense, defendant called two witnesses who said defendant was around the corner from the scene at the time of the shooting. Bright, 98-0398 at 3-8, 776 So.2d at 1137-40. One of the witnesses claimed to have seen Tracey Davis fleeing the scene immediately after the shooting. In closing argument, the defense posited that Tracey Davis and his cousin committed the crime.
Significantly, the State used the criminal records of both defense witnesses to impeach their testimony. Shelita Christmas, the mother of defendant's two children, testified that defendant was knocking at the gate of a friend's home when shots rang out; she next saw two men running, rounding the corner at Laussat Street and passing by her as the men continued on Montegut Street. The State contended Christmas was unworthy of belief, in part, because she had a prior drug conviction. William "Yam" Thomas testified defendant was standing at the gate of the Thomas residence on Montegut Street when shots rang out in the neighborhood. He stated he was compelled to come forward to testify because "the wrong man g[ot] charged... because I'm looking right at him [at the time of the shooting]." Bright, 98-0398 at 9, 776 So.2d at 1140. Thomas had a year-old charge for possession of heroin with intent to distribute pending at the time of defendant's trial. The State also used Thomas's prior convictions for theft and possession of stolen goods in 1959 and for illegal carrying of a weapon in 1976 to impeach his testimony.
The Brady issue in this case arises from the State's suppression of the criminal history of Thompson, its star witness. As noted above, only Thompson, who acknowledged he had been drinking for *43 many hours prior to the shooting, identified defendant. In addition, the identification came some weeks after the crime. This information was presented to the jury, but jurors did not learn that Thompson had a prior conviction for simple burglary and was on parole[5] at the time of the offense and at the time of his subsequent identification of defendant in the photographic lineup. The prosecution had responded "not entitled" to a pre-trial request by the defense for the production of rap sheets of the State's witnesses. The State now admits this response was wrong and admits the evidence should have been disclosed.
Information about a witness's convictions is admissible and can form an important source for impeachment of such witnesses. See, LSA-C.E. art. 609.1; see generally, State v. Tolbert, 03-0330 (La.6/27/03), 849 So.2d 32. The fact that Thompson was under the supervision of the Department of Public Safety and Corrections ("DOC") at the time of the shooting and could have been subject to parole revocation for violation of the terms of his parole (by drinking, as he admitted doing),[6] gave him the motivation to cooperate with law-enforcement authorities, motivation defendant had a right to reveal to the jurors. See, e.g., Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) (Bias may arise from a witness's vulnerable status as a probationer; the Sixth Amendment right to confrontation includes the right to cross-examine a prosecution witness concerning a possible source of bias.) The importance of such information can be heightened in a case such as defendant's, where only one witnessthe felon whose record the State suppressedidentified defendant. The only evidence relied on to convict defendant was Thompson's testimony; there were no other witnesses, and there was absolutely no physical evidence.
Compounding the significance of the State's failure to disclose is the fact that the State utilized the same type of impeachment evidence of prior convictions that was withheld from the defense. Defendant's two alibi witnesses both "suffered a ... loss of credibility" when the State cross-examined them about their convictions. Bright, 09-0398 at 8-9, 796 So.2d at 1140. A second trial will place the case before a decision-maker informed of the material suppressed at the first trial. Thus, an informed decision-maker, in evaluating credibility, can consider the relative degrees of moral culpability exhibited by convictions for such things as drug offenses and possession of stolen goods as contrasted with a conviction for burglary and subsequent parole violations.
Defendant has shown that the State suppressed the criminal history of its main witness, the only witness to identify defendant in a case in which there exists no physical evidence. In this situation, the evidentiary suppression rises to a level such that we can have no confidence in the verdict and requires reversal. Kyles, 514 U.S. at 434, 115 S.Ct. at 1566. When the *44 State's case hinges on the testimony of one eyewitness, the Brady violation looms larger. In Agurs, 427 U.S. at 113, n. 21, 96 S.Ct. at 2402 n. 21, the Supreme Court quoted with approval an example from Comment, Brady v. Maryland and The Prosecutor's Duty to Disclose, 40 U.Chi. L.Rev. 112, 125 n. 10 (1972):
If ... one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness. But if there were fifty eyewitnesses, forty-nine of whom identified the defendant, and the prosecutor neglected to reveal that the other, who was without his badly needed glasses on the misty evening of the crime, had said that the criminal looked something like the defendant but he could not be sure as he had only had a brief glimpse, the result might well be different.
The State has conceded the prosecution failed to disclose before trial that Thompson, its only eyewitness to the victim's murder who claimed he could identify defendant as the perpetrator, had a prior felony conviction. Nevertheless, the State argues that its failure to disclose the criminal history of its star witness does not rise to a level of materiality requiring reversal. We remain unconvinced by this argument, noting that nothing in the State's opposition negatively affects the conclusion that the State committed an evidentiary suppression that undermines confidence in the outcome of the trial. Kyles v. Whitley, 514 U.S. at 434, 115 S.Ct. at 1566.[7]

CONCLUSION
We conclude the State's failure to disclose the criminal history of its key witness, Thompson, violated defendant's due process rights and requires reversal under the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and progeny. Although the State now concedes the evidence of its key witness's criminal record should have been revealed to the defense, we hasten to point out that a Brady analysis focuses on the harm to the defendant resulting from nondisclosure rather than on the willful misbehavior of the prosecutor. Agurs, 427 U.S. at 104, 96 S.Ct. at 2398 n. 10. The detriment to the defendant in the instant case cannot be discounted. After a careful review of the facts unique to this case, we can have no confidence in the verdict.
The sole witness to claim he could identify defendant as the shooter was Thompson, who spent the better part of the day of the crime consuming alcoholic beverages and thus was in de facto violation of his parole. At the time he identified the defendant as the shooter, Thompson remained on an extended parole. The specific facts of Thompson's criminal record and the fact that he was still on parole in 1995 raise questions about the veracity of his trial testimony. To compound the detriment to the defendant, the State used the very type of evidence withheld from the defendant to effectively impeach the defendant's witnesses.
*45 Significantly, the only evidence that resulted in a conviction was Thompson's testimony. The investigation of the shooting, which involved the FBI, as well as local authorities, failed to produce any physical evidence, such as the missing envelope of money, a gun, or DNA evidence, to connect defendant to the shooting.
The twofold aim of the law is that "guilt shall not escape or innocence suffer." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Society remains at risk if the guilty remain at large. Finality is an important component of any legal proceeding. Endless delays and countless reviews undermine finality. However, finality must yield when those responsible for assuring compliance with the law do not follow the rules and it is determined that there can be no confidence in the verdict. Reversals should only occur when there can be no confidence in the verdict. This conviction, based on the facts of this case which include a failure to disclose what the State now admits is significant impeachment evidence, is not worthy of confidence and thus must be reversed.
WRIT GRANTED; CONVICTION AND SENTENCE VACATED; CASE REMANDED FOR NEW TRIAL.
NOTES
[1] Although not relevant to our determination, we note the reason for the FBI's investigation of this local matter remains unexplained to this court.
[2] The FBI initially responded to defendant's filings with a redacted version of a statement by a confidential informant, who stated another individual had "bragged" about committing the murder that Bright was in jail for committing. Ordering the FBI to provide defendant with an unredacted version (which named Tracey Davis as the individual who claimed to be the shooter), the federal court noted: "The failure by law enforcement agencies to disclose the statement before [Bright's] murder trial raises the stakes of the public interest.... Whether Bright is or is not guilty, the failure of law enforcement to act as it was constitutionally obliged to do cannot be tolerated in a society that makes a fair and impartial trial a cornerstone of our liberty from government misconduct."
[3] The record reflects that Thompson procured the truck keys from the wounded Barnes in order to leave the scene of the shooting before the police arrived.
[4] A defense witness testified at trial that defendant is left-handed and that his left hand had been injured and was in a bandage or cast at the time of the shooting.
[5] The rap sheet is confusing in that it states Thompson was "paroled" but also states he was arrested for "probation violation" and "probation" was revoked. We choose to refer to his "parole" in this opinion.
[6] The statute setting out mandatory conditions of parole merely requires parolees to "[a]void injurious or vicious habits and places of disreputable or harmful character," LSA-R.S. 15:574.4(H)(4)(d), but the standard form distributed to parolees by the Board of Parole requires inmates to "solemnly promise and agree" to "avoid injurious or vicious habits and places of harmful disreputable character, which includes the ingestion of alcoholic beverages and/or frequenting establishments where alcohol is the primary commodity served or sold."
[7] We hasten to caution that the determination of materiality requiring reversal of a conviction when a Brady violation occurs is an "inevitably imprecise standard." Agurs, 427 U.S. at 108, 96 S.Ct. at 2400. We have pretermitted the other issues raised by defendant. He argues there is evidence concerning his actual innocence. Such evidence can impact a decision that the Brady violation is of a nature that requires reversal because the determination of materiality for Brady purposes is necessarily fact specific. Given our decision to reverse, it is not necessary to evaluate this evidence.