EDWIN A. LOMBARD, Judge.
 

 hThe defendant, Nathan Foreman, appeals his conviction for second degree murder, a violation of La.Rev.Stat. 14:30.1. After review of the record in light of the applicable law, the arguments of the parties, and for errors patent, we affirm the defendant’s conviction and sentence.
 

 Relevant Facts and Procedural History
 

 On March 6, 2005, Myra Mehrtens, a seventy-four year old resident of New Orleans, was shot and killed in a robbery in front of her home at 22 Warbler Street in the Lake Vista area. Shortly thereafter, in May 2005, the defendant was indicted for first degree murder of Myra Mehrt-ens,
 
 [1]
 
 but on February 9, 2008, the charge was amended to second degree murder.
 

 After a three day trial, a jury found the defendant guilty as charged on February 21, 2008. He filed a motion for new trial on March 3, 2008, which was denied on March 6, 2008. He re-urged the motion on March 7, 2008, but the trial court declined his request for an evidentiary hearing on the motion and denied the motion that same day. The defendant was sentenced to life imprisonment without |gbenefit of
 
 *1240
 
 parole, probation, or suspension of sentence. The court denied Foreman’s motion to reconsider sentence but granted his motion for appeal.
 

 Discussion
 

 On appeal, the defendant challenges the sufficiency of the evidence and the judgment of the trial court denying his motion for a new trial
 

 Sufficiency of the Evidence
 

 Pursuant to
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, (1979), when reviewing the sufficiency of the evidence to support a conviction, an appellate court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.”
 
 State v. Neal,
 
 00-0674, (La.6/29/01) 796 So.2d 649, 657 (citing
 
 State v. Captville,
 
 448 So.2d 676, 678 (La.1984)). When circumstantial evidence is used to prove the commission of the offense, La.Rev.Stat. 15:438 requires that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”
 
 Neal,
 
 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under
 
 Jackson
 
 to prove guilt beyond a reasonable doubt to a rational jury.
 
 Id.
 
 (citing
 
 State v. Rosiere,
 
 488 So.2d 965, 968 (La.1986)).
 

 La.Rev.Stat. 14:30.1 provides in pertinent part that second degree murder is “the killing of a human being: ... (2) When the offender is engaged in the perpetration ... of ... armed robbery ... even though he has no intent to kill or inflict great bodily harm.”
 
 See State v. Allen,
 
 2003-2156 (La.App. 4 Cir. 5/19/04), 876 So.2d 122. In addition, La.Rev.Stat. 14:24 provides that principals to a crime who are those who are “concerned in the commission of a crime, whether ^present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime.” In order to be convicted as a principal, the State must show that a defendant has the requisite mental intent to commit the crime.
 
 See State v. Newman,
 
 2003-1721 (La.App. 4 Cir. 7/7/04), 879 So.2d 870.
 

 The following evidence was adduced at trial. Ms. Mehrtens’ daughter, Sharon Jambronie, testified that on the afternoon of Sunday, March 6, 2005, Ms. Mehrtens dropped Veronica (Ms. Jambronie’s daughter) at Ms. Jambronie’s home and said that she was going home. Later that evening, Ms. Jambronie received a call that her mother had been shot, went to her mother’s house, and accompanied her mother to the hospital where she died in surgery.
 

 Jonathan Bailey testified that at approximately 7:30 p.m. on March 6, 2005, the defendant picked him up at work in the defendant’s mother’s car and the two men drove back to their neighborhood. The defendant concocted the plan to rob someone and they contacted a friend, Christopher Cavalier, to obtain a gun. Without telling Cavalier why they wanted a gun, the two men picked Cavalier up at his girlfriend’s house, took him to his own house to get the gun, and then (after receiving the gun) back to his girlfriend’s house. Then Bailey and the defendant drove around looking for someone to rob. Bailey noticed a car and told the defendant to follow it. According to Bailey, he chose the victim’s car because it was the only one in the area at that time. The defendant parked the car where he could not see the victim’s house and Bailey got out of the car with the gun. Bailey stated that he robbed the victim, and “unfortunately she was shot.” Bailey explained that when he
 
 *1241
 
 reached victim’s car and saw that she was elderly, he became startled. The victim asked him not to shoot her and Bailey told he would |4not do so but she activated the car alarm which caused him to flinch and the gun went off. Accordingly, he grabbed the victim’s purse and another bag from her hand and ran back to the defendant who was waiting in the car. Bailey told the defendant what happened in response to the defendant’s questions and they drove away from the scene. The two men found $10.00 in the victim’s purse (which they kept) and threw the rest of the contents of the purse out the car window. After calling Cavalier to tell him that they were returning his gun, Bailey and the defendant picked him up from his girlfriend’s house and drove him to his house. According to Bailey when they returned the gun to Cavalier, they told him to put the gun up because “I did a little somethin [sic]” with it. Bailey, Cavalier, and the defendant went out later that evening.
 

 Several days later, on March 11, 2005, a SWAT team of the New Orleans Police Department (NOPD) kicked in Bailey’s door and arrested him for murder. According to Bailey, when the officers took him to the police station, the defendant was already there. At first, Bailey denied knowing about the murder but conceded that he shot the victim when confronted with the information that the defendant had already related the events of Ms. Mehrtens murder. Bailey admitted that he pleaded guilty to first degree murder, but insisted that he had made no deal with the State prior to pleading guilty. He testified that he had earlier refused to testify at the defendant’s trial, but changed his mind the day before trial began.
 

 On cross-examination, Bailey admitted that he was the person who shot the victim and that he pleaded guilty in order to receive a life sentence. He testified that when he arrived at the police station, the officers did not advise him of his rights. He stated that he thought he had “gotten away with it” until the officers told him what the defendant had said. He insisted that the officers handcuffed him in |flhis chair, hit him in the face, put a gun in his mouth, and threatened to kill him. He stated that the officers stopped beating him when he admitted that he had killed the victim. He admitted, however, that he never told the prosecutors that the officers beat him. On redirect examination, Bailey stated that he truthfully told the officers that he was the triggerman, insisting that the prosecutors did not tell him what to say.
 

 Ms. Mehrtens’ neighbor, Marianne Cherry, also testified. Ms. Cherry testified that there was a small alleyway with foliage between her house at 24 Warbler and the victim’s house and that her house has a rarely-used door that opens onto the joint alleyway. On the evening of March 6, 2005, Ms. Cherry was sitting in her family room, which faced the alleyway, and heard a popping noise. After her dog began barking, she heard banging on her side door and her name being called. Ms. Cherry testified that she became frightened and screamed for her husband, who was in a different part of the house. She turned off the lights in the room, called 911, and called Ms. Mehrtens’ house to warn her that someone was outside but there was no answer. She identified her voice on a 911 tape
 
 [2]
 
 , and stated that she told the 911 operator that she heard a car alarm. She stated that her husband also
 
 *1242
 
 called 911. Ms. Cherry testified that when the police arrived, she refused to go outside to talk with the officers; instead, she spoke to them from inside her house.
 

 Katie Fury testified that she lives diagonally across the street from Ms. Mehrtens’ house. Ms. Fury testified that at the time of the murder she was working on her computer in her room that overlooks the street. She heard a boom which she attributed to fireworks. She got up, looked out the window, heard a car |fialarm, and then saw a small, white, older model car with a burned-out tail light speeding down the road.
 

 Sergeant Paul Long of the NOPD testified that he was called to the scene of the murder at approximately 8:45 p.m. on March 6, 2005. He stated that the call to the police first came as a call for an ambulance, then as a possible shooting. He stated that emergency medical personnel were there when he arrived with the unconscious victim in the back of the ambulance. Accordingly, he secured the scene. He testified that he saw a blood trail leading from the side of a Lincoln parked in the driveway and that he followed the trail through the yard into the alleyway next to the house, where he found a large pool of blood.
 

 Brian Corcoran testified that he was Ms. Mehrtens’ son-in-law. He stated that he opened Ms. Mehrtens’ house for the police to see if anything was missing, but nothing had been taken from inside the house.
 

 Dr. Samantha Huber, stipulated to be an expert in forensic pathology, testified that she conducted the autopsy on Ms. Mehrt-ens on March 7, 2005. She testified that Ms. Mehrtens had been operated on prior to her death. Dr. Huber testified that Ms. Mehrtens suffered a gunshot wound to the right side of her neck, and the bullet exited through her back. Dr. Huber testified that the bullet broke Ms. Mehrtens’ fourth rib and hit her big veins, causing great loss of blood. She testified that this wound, though fatal, would not have instantaneously caused death; instead, the victim would have been able to walk, speak, and remain conscious for a short time.
 

 Detective Sergeant Doug Eckert testified that he was the Homicide Commander for the Third District at the time of the murder. He stated that Ms. |7Mehrtens had already been transported from the scene and crime lab personnel were on the scene when he arrived. He identified photographs taken from the scene that depicted Ms. Cherry’s side door, which had blood smears on it. He stated that the officers found a set of keys hanging off of a flowerpot next to the driveway. He testified that the police impounded Ms. Mehrtens’ car, but a subsequent search revealed no evidence. He stated that officers returned to the scene a few times the next day, but it was not until March 8 that a police dog found a casing and a projectile which were seized and sent to the crime lab for testing. Detective Sergeant Eckert testified that the police received information concerning the possible perpetrators of the crime and on Thursday evening he obtained arrest warrants for Foreman and Bailey. He testified that they executed the warrants on Friday morning, transporting the defendant and Bailey to the police station. After being advised of his rights, the defendant told the officers where he and Bailey obtained the gun and that they had returned the gun to the same person. Accordingly, Detective Sergeant Eckert dispatched officers to Cavalier’s house to secure it and upon his arrival Cavalier’s mother agreed to call Cavalier. Cavalier returned home and told the police officers that he had hidden the gun in the trunk of his sister Nicole’s car. Police officers subsequently stopped Nicole and
 
 *1243
 
 her car elsewhere and when Detective Sergeant Eckert arrived at the scene of the stop, he advised Ms. Cavalier of her rights. Ms. Cavalier told Detective Sergeant Ec-kert that she did not know what her brother had put in the trunk and consented to a search of the trunk. Pursuant to the search, the officers found a gun and a magazine wrapped in a cloth bag. Detective Sergeant submitted the gun and magazine for testing.
 

 ROn March 14, 2005, Detective Sergeant Eckert returned to the scene of the murder and retraced the route that the suspects told him they took when they left the scene. On the neutral ground on Robert E. Lee Boulevard, Detective Sergeant Ec-kert found a card in Ms. Mehrtens’ name from a health club.
 

 On cross-examination, Detective Sergeant Eckert admitted no physical evidence was recovered on the night of the murder that indicated the defendant left the car at the scene of the crime. He testified that although Ms. Mehrtens’ car was dusted for fingerprints, he did not know if any were found and, further, he admitted that nothing found in the car implicated the defendant in the murder. He stated that the casing was found on what would have been the passenger side of the car if the car had still been parked there. Detective Sergeant Eckert testified that when he interviewed the defendant, he asked him if he had seen the gun before Bailey got out of the car at the murder scene and the defendant replied that he did not see the gun until after Bailey returned to the car after the shooting. He related, however, that the defendant admitted that he had seen the gun at Cavalier’s house. He stated that the defendant claimed that he had no idea that Bailey was going to rob someone; rather, Bailey told him that he was going to collect some money that someone owed him. Detective Sergeant Eckert stated that he did not see anyone beat Bailey or put a gun in his mouth at the police station and he denied that Bailey had been threatened in order to obtain a statement from him.
 

 Christopher Cavalier testified that at approximately 6:00 p.m. on March 6, 2005, he was at his girlfriend’s house when he received a call from the defendant and Bailey. He testified that the men picked him up in the defendant’s mother’s car and took him to his house to retrieve a gun that they both asked to borrow. After Cavalier gave the defendant and Bailey the gun, they took him back to his Rgirlfriend’s house. A few hours later, they came back and picked him up again and, as they drove him back to his house, Bailey returned his gun. According to Cavalier, Bailey said that they had done “a little something” with it and then both men laughed. Cavalier put the gun back in his yard to hide it from his mother and then went back to the car and rode around with the defendant and Bailey for a few hours. The next day (Monday), Cavalier heard about the murder and on Tuesday, he called his sister and asked her to bring her car to his house. He testified that he asked her to do him a big favor by taking the gun. She handed him the keys and went inside the house, and he hid the gun in the trunk of her car. He testified that he did not tell her what he put in her trunk.
 

 The following Friday, Cavalier received a call that police officers were at his house. He went home and, under questioning, told the officers where he put the gun. The officers took him to the police, station where, after being advised of his rights, he gave a statement. The police arrested him for being a principal to the murder and the armed robbery, as well as for having a gun with an obliterated serial number. He pleaded guilty to the weapons charge and
 
 *1244
 
 an unrelated aggravated assault charge pursuant to an agreement and was sentenced to two years probation. The accessory to murder charge was dropped.
 

 On cross-examination, Cavalier stated that he was originally arrested for first degree murder but then charged with being an accessory to murder. He conceded that he knew that he was looking at a life sentence or the death penalty for the murder charge and that his sentence as an accessory would be at most five years imprisonment. He testified that he was in jail for five and a half months until his mother paid his bond. He stated that he made the plea deal in exchange for his testimony, but he never told the police that he gave the gun to the defendant or that | mthe defendant asked him for the gun. He testified that he had had the gun for only a day before he loaned it to the defendant and Bailey. On redirect, Cavalier testified that he is still on probation and lives in Houston. He reiterated that both the defendant and Bailey came to get the gun from him and both were present when they returned the gun. He stated that he did not ask them why they wanted the gun and that he had no direct knowledge of what they did with it. He testified that because they were laughing when they returned the gun, he did not think they had done anything bad with it.
 

 The final witness was Detective Harold Wischan, the NOPD officer in charge of the murder investigation. He testified that when he arrived on the scene, Ms. Mehrtens’ car was still parked in the driveway; there was blood near the driver’s door, and keys in a nearby flowerpot next to the blood. He testified that a blood trail led around the front of the car, across the front yard, to a wooden gate. The trail continued through the gate to the right side of the house next door and ended in a pool of blood at the side door of the house. He stated that there were bloody handprints on the door. Detective Wischan testified that the lighting was poor at the time he arrived on the scene and that he had Ms. Mehrtens’ car towed. He testified that he interviewed a neighbor who lived across the street and that she told him she heard the gunshot and the car alarm just before she saw a white car with a missing taillight leave from the front of the victim’s house and speed down the street toward Marconi Avenue.
 

 Detective Wischan testified that he and other officers returned to the scene the next day with metal detectors, but they were unable to find any ballistics evidence. He stated that they returned a few days later with a police dog that found the spent casing in the shrubbery and the pellet in the planter box that stood to thejuleft of where the car had been parked. He testified that the victim’s missing purse and cell phone were not found inside her house or in her car. Detective Wischan testified that on March 10, 2005, he obtained arrest warrants for the defendant and Bailey, as well as search warrants for their houses and that the warrants were executed the next morning. He testified that Bailey tried to escape through a hole in the wall at his house, but was apprehended. Detective Wischan testified that the police also seized the defendant’s mother’s car. He stated that both defendants were taken to the police station where they were advised of their rights and agreed to give statements. The State then played the videotaped statements for the jury. Detective Wischan testified that after the suspects gave the police Cavalier’s name and address, officers obtained an arrest warrant for him and a search warrant for his house. Detective Wischan recounted the officers’ seizure of the gun from Cavalier’s sister’s car. He testified that testing of the gun showed that the casing and pellet
 
 *1245
 
 found at the murder scene were fired from that gun.
 

 Detective Wischan testified that, after interviewing Foreman and Bailey, he and Detective Sergeant Eckert walked the route the defendants said they took after the shooting. He testified that they found the victim’s health club identification card on the neutral ground of Robert E. Lee, and on Paris Avenue they found a smashed cell phone that they later verified had belonged to Ms. Mehrtens. He testified that the defendant’s mother’s car was white and might have had a burned-out taillight. He testified that the defendant told the officers before giving his statement that he did not need a lawyer. He stated that Bailey never denied his involvement in the murder; Detective Wischan denied putting a gun in Bailey’s mouth to get him to confess. Detective Wischan conceded that Bailey’s statement 112was the only evidence of the defendant’s involvement in the armed robbery of Ms. Mehrtens.
 

 The parties stipulated that if the expert firearms examiner were to testify, she would state that the casing and bullet seized from the scene were fired from the gun that the officers took from the trunk of Nicole Cavalier’s car.
 

 On appeal, the defendant does not dispute that Ms. Mehrtens was killed during the perpetration of an armed robbery but maintains that there was no evidence, other than that of Jonathan Bailey, to show that he knew that Bailey intended to rob Ms. Mehrtens when he let him out of the car prior to the murder. The defendant contends that Bailey’s testimony is not credible because Bailey conceded on cross-examination that he reached an agreement with the prosecution prior to his testimony. Moreover, the defendant contends argues the there is no evidence he was aware that Bailey received a gun from Cavalier and, accordingly, his participation as the driver in the robbery is insufficient to establish the requisite intent and state of mind to partake in an armed robbery.
 

 Viewed in the light most favorable to the prosecution, a rational trier of fact could find based upon Bailey’s testimony alone that the defendant intended to participate in the robbery of Ms. Mehrtens. Moreover, in this case, the defendant’s knowledge of the gun before the robbery was established by the testimony of two witnesses, Bailey and Cavalier. Thus, in addition to Bailey’s testimony, Cavalier provides corroborating evidence that the defendant knew about the gun and, thus, had the requisite intent for armed robbery.
 

 Bailey’s initial testimony that he made no deals with the State and subsequent concession on cross-examination that he pleaded guilty to first degree murder in exchange for his testimony against the defendant and the stipulation that | ,3he would not receive the death penalty goes to his credibility. In this case, however, the jury was clearly aware of the fact that both Bailey and Cavalier agreed to testify against the defendant in return for plea agreements and, nonetheless, found their testimony to be believable and we do not disturb a factfinder’s credibility decision on appeal unless it is clearly contrary to the evidence.
 
 State v. Huckabay,
 
 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093. There is nothing in the record to show that the jury abused its discretion in its credibility findings and the evidence presented at trial supports the jury’s verdict that the defendant was a principal to the armed robbery and, thus, a principal to the second degree murder that resulted from the armed robbery. Accordingly, this assignment of error is without merit.
 

 Denial of the Motion for a New Trial
 

 The defendant also argues that the trial court erred by denying his motion for new trial without allowing him to present evi
 
 *1246
 
 dence at an evidentiary hearing. He asserts that one of the principal witnesses against him, Christopher Cavalier, lied about not having any prior felony convictions and that he did not discover until after trial that Cavalier had a prior California deferred adjudication of guilt concerning what appeared to be a felony offense. He argues that because Cavalier’s prior deferred adjudication could have been used to impeach Cavalier’s credibility, the omission of this impeachment evidence casts doubt on the validity of the jury’s verdict and, as such, he is entitled to a new trial.
 

 At trial, Cavalier testified that he was originally arrested as a principal to first degree murder, accessory to first degree murder, and having a gun with an obliterated serial number. He has originally charged with the weapon and with being an accessory. The prosecutor asked Cavalier if he had made a deal with the | MState “to tell the truth of your knowledge” and he replied that the State agreed to give him two years probation for unrelated assault charges and the weapons charge and to drop the accessory after the fact charge if he agreed to testify against the defendant and Bailey. On cross-examination, Cavalier stated that he knew that as an accessory to first degree murder he could receive up to five years imprisonment, for first degree murder he could receive the death penalty or life imprisonment, and for armed robbery he could received ninety-nine years. He admitted that he was on inactive probation in Houston where he lives and that his convictions could be expunged. He also stated that the prosecutor told him that the State would revoke the plea agreement if the prosecutors thought he lied on the stand. On redirect, Cavalier insisted that he was still on probation, that he had to contact his probation officers every week and pay fees, and that he has not expunged any of his convictions.
 

 On March 3, 2008, the defense filed a motion for new trial, alleging only that the verdict was contrary to the law and evidence. On March 6, the court denied the motion and the request for an evidentiary hearing. When the parties appeared the next day, defense counsel urged the court to reconsider its ruling, noting that he had received documents the day before from Houston indicating that at the time of trial Cavalier had a prior conviction there for which he had been placed on probation. Defense counsel noted that the conviction was labeled a “deferred adjudication of guilt” for a felony, which he indicated meant that Cavalier had been convicted but placed on probation. Defense counsel stated that he asked Cavalier the night before about the conviction and Cavalier told him that he did not remember if he told anyone from the State about this conviction. Defense counsel stated that when he pressed Cavalier about it, Cavalier told him hsthat he did not want to talk to counsel any longer. Defense counsel then urged the court to hold an evidentiary hearing on the matter. The prosecutor responded by first noting that any error that may have occurred with respect to this prior conviction, if indeed it was a conviction, was harmless in light of Bailey’s testimony. She further noted that she was unsure what a “deferred adjudication of guilt” meant, and she pointed out that this adjudication did not appear on Cavalier’s rap sheet, which the State provided the day before. Defense counsel responded that Cavalier’s probation had been revoked in that case. The court indicated that it also was not sure what a “deferred adjudication of guilt” meant, but it declined to change its ruling denying the motion for new trial. The court then sentenced the appellant.
 

 On appeal, the defendant argues that the trial court erred by denying the motion
 
 *1247
 
 for new trial without allowing him to present evidence at an evidentiary hearing. He asserts that Cavalier lied under oath when he said he had not been convicted of any other crimes except the misdemeanor assault charges and gun charge. Citing
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defendant contends that the exculpatory evidence of Cavalier’s prior felony conviction in Houston was withheld from him and he could have used this information to impeach Cavalier’s credibility. Because he was not made aware of this impeachment evidence, he asserts he is entitled to a new trial.
 

 To fall within with scope of
 
 Brady,
 
 however, the defendant must show that the State withheld evidence that is favorable to the defense and material to guilt or punishment. He must also show that there is a reasonable probability that the result of the trial would have been different if the evidence had been produced and, thus, its omission cast doubt on the confidence of the verdict.
 
 See Kyles v. Whitley,
 
 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995);
 
 State v. Bright,
 
 2002-2793 (La.5/25/04), 875 So.2d 37. In this case, the defense would have been allowed to impeach Cavalier on any prior felony conviction but there has been no showing that the State knew of this “conviction,” if indeed it is one, and withheld knowledge of it from the defense. Indeed, at the March 7th hearing the prosecutor indicated that it was not included in the rap sheet the State presented to the defense and we do not find it listed on the rap sheet included in the appeal record. Defense counsel admitted at the hearing that Cavalier told him that he did not remember mentioning this adjudication to the prosecutors and, accordingly, it does not appear that the State knew of this prior adjudication and withheld knowledge of it from the defense.
 

 Moreover, it does not appear that the omission of evidence of this prior deferred adjudication undermined confidence in the jury’s verdict. The jury was aware that Cavalier testified against the defendant in exchange for the State first electing to charge him only with the accessory to murder and then dropping that charge and allowing him to plead guilty to the obliteration of a weapon charge and to two unrelated assault charges for which he received inactive probation. Thus, the jurors had a stronger basis upon which to find Cavalier’s testimony suspect but, nonetheless, found that his testimony was credible. Further, Cavalier’s testimony was cumulative to that of Bailey. Both witnesses testified that the defendant and Bailey solicited Cavalier for the gun that was used in the robbery and murder. Both witnesses testified Cavalier gave the gun to both Bailey and the defendant and that the Bailey and the defendant returned the gun to Cavalier after the murder. Both witnesses testified that when Bailey and the defendant returned the gun, Bailey told him that they had done “a little something” with it. As such, the defendant has not shown that the omission of evidence of Cavalier’s deferred adjudication of guilt, |17even if it could have been considered to have been a felony conviction with which he could have been impeached, undermined confidence in the jury’s verdict.
 

 Therefore, the trial court did not err by denying the appellant’s motion for new trial that was based on his oral claim that the State withheld
 
 Brady
 
 material and this assignment of error is without merit.
 

 Errors Patent
 

 A review of the record for errors patent reveals that the defendant failed to plead to the amended bill of indictment, which the State amended to second degree murder just prior to the start of trial.
 
 *1248
 
 However, the defendant did not object to this omission. Because the failure to arraign a defendant is harmless if the defendant goes to trial without objecting to the failure, La.Code Crim. Proc. art. 555, this error is harmless.
 

 Conclusion
 

 Accordingly, the defendant’s conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Jonathan Bailey, also charged in the same indictment with the same crime, pleaded guilty as charged in May 2007 and was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. His plea and sentence are not the subject of this appeal.
 

 [2]
 

 . The parties stipulated as to the authenticity of the 911 recordings made on March 6, 2005 by Marianne Cherry