# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-1179

**STATE OF LOUISIANA**

**VERSUS**

**BRENT AUTHORLEE**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 08-599
HONORABLE LORI ANN LANDRY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and J. David Painter, Judges.

**AFFIRMED.**

**J. Phillip Haney**
**District Attorney**
**300 Iberia Street, Suite 200**
**New Iberia, LA 70560**
**Telephone:  (337) 369-4420**
**COUNSEL FOR:**
     **Plaintiff/Appellee - State of Louisiana**

**Paula Corley Marx**
**Louisiana Appellate Project**
**P. O. Box 80006**
**Lafayette, LA 70598-0006**
**Telephone:  (337) 991-9757**
**COUNSEL FOR:**
     **Defendant/Appellant - Brent Authorlee**

**Angela B. Odinet**
**Assistant District Attorney**
**415 Main Street**
**St. Martinville, LA 70582**
**Telephone:  (337) 394-2220**
**COUNSEL FOR:**
      **Plaintiff/Appellee - State of Louisiana**

**THIBODEAUX, Chief Judge.**

Defendant, Brent Authorlee, was charged by bill of indictment with second degree murder in violation of La.R.S. 14:30.1. Defendant entered a plea of not guilty, and he was convicted by a unanimous jury verdict.

Defendant was sentenced to the mandatory term of life in prison, at hard labor, without benefit of probation, parole, or suspension of sentence. Defendant appeals and asserts a single assignment of error, that the totality of the evidence presented at trial, which was entirely circumstantial, was insufficient to support the jury's verdict of second degree murder. Defendant requests that this court reverse the jury's verdict and vacate the conviction against him because the State failed to establish the requisite proof that Defendant committed the crime beyond a reasonable doubt. We cannot honor that request. We affirm Defendant's conviction.

## I.

### ISSUE

We will consider whether the State presented sufficient evidence at trial to support Defendant's conviction.

## II.

### FACTS AND PROCEDURAL HISTORY

The victim, Michelle Kenney, was a waitress at the Little River Inn in New Iberia, Louisiana. Defendant was employed as kitchen staff. At trial, the owner and manager of the Little River Inn testified that Defendant and the victim first initiated a work relationship that culminated into a more personal relationship

around October 2007. The owner testified that she observed Defendant and the victim act affectionately toward one another until a work Christmas party on December 16, 2007, when the relationship began to involve hostile arguments. The owner observed an argument between the two, wherein Defendant made references regarding the victim's new boyfriend, Craig Hebert, and her relationship with Hebert. The owner testified that the hostility between the victim and Defendant increased progressively to the point that she was uncomfortable working around the two.

On February 14, 2008, Defendant was released from employment at the Little River Inn, and his final paycheck was withheld until he agreed to return a gold-colored comforter to the victim. According to the owner, Defendant returned the comforter to the victim on February 22, 2008.

The victim's boyfriend, Hebert, reported last seeing the victim a week before her death on February 17, 2008. On February 24, 2008, Defendant and the victim were identified on a surveillance video at a convenience store.

Sometime between the late evening hours of February 24, 2008, and the early morning hours of February 25, 2008, the victim was killed in her residence, which also served as the business where she worked, Patout-Greenwood Insurance Company.

The victim's body was found after a neighbor, Julius Segura, called 9-1-1 to report a potential break-in at the victim's business-residence. Police Officer Kenneth Franques responded to the call. Upon arrival at the business-residence, he found that a rear window to the building was broken. He also found the front door unlocked and the victim's bedroom in disarray.

The victim's body was found under a gold-colored blanket. A serrated knife was found in the victim's possession, and several injuries were noted. A forensic pathologist, Joel Carney, testified that the cause of the victim's death was an incised wound to the neck, with the manner of death being homicide. Specifically, the victim's throat had been cut from ear-to-ear with an incision that was deep enough to sever her throat and jugular vein and ultimately leave a tool mark on her back vertebra. The wound was immediately fatal.

Blood evidence was found in the victim's bedroom, including some on her body, the gold-colored comforter, and a storage container next to her body. Fingernail clippings and hair samples were collected from the victim and the surrounding area. Authorities also collected a cigarette butt found on a coffee table in the living room of the residence.

*DNA Evidence*

The serrated knife found in the victim's possession was tested for DNA evidence. An expert DNA analyst testified that a Y-chromosome profile, consistent with Defendant's DNA, was found on the handle of the knife. The examiner stated, however, that the DNA was not a specific match to Defendant's DNA but that Defendant could not be excluded as a source of the DNA. The examiner testified that the particular Y-chromosome profile found excluded 99.92 percent of the general male population, leaving only 1 in 1,300 males that could have left the profile. The 1 in 1,300 males represented males that would be related to Defendant in a direct familial line.

Fingernail clippings from the victim were also tested for DNA. Defendant could not be excluded as a source of DNA found under the fingernails

of the victim. The statistics cited by the expert DNA analyst showed that, based on the particular type of DNA, 99.92 percent of the male population could be excluded and that the DNA was found in 1 in 1,300 males. Again, the 1 in 1,300 males would be those related to Defendant in a direct familial line. The expert testified to a reasonable degree of scientific certainty that Defendant was the source of the DNA found under the fingernails of both of the victim's hands.

Defendant's DNA, along with the victim's DNA, was found on a knife located in a block of knives in the kitchen of the residence. The cigarette butt located on the coffee table in the victim's residence also contained DNA from the Defendant and a third-party, Ms. Lillian Lucille Green-Verret.

*The Victim's Vehicle*

Green-Verret testified that Defendant picked her up in the victim's white Lincoln Town car on February 24, 2008, the night of the murder. Defendant drove her to the victim's residence sometime before midnight. Defendant exited the vehicle upon arrival and entered the victim's residence through a back entrance, while Green-Verret waited in the vehicle. Defendant later gestured for Green-Verret to come inside.

Green-Verret entered the residence and sat on a couch in the living room, while Defendant proceeded to a back bedroom and closed the door. Green-Verret stated that she did not hear any voices from the back bedroom but did hear sounds of furniture being moved around. She also did not hear any glass break while at the victim's residence.

Green-Verret testified that she sat on the couch and waited for Defendant for approximately twenty to twenty-five minutes. During this period,

4

she asked Defendant for a cigarette, and he handed her, one through a crack in the bedroom door. He had been smoking the cigarette. Because the bedroom door was cracked, Green-Verret could only slightly see into the bedroom, but she did notice it appeared "messed up" or in disarray. Green-Verret then sat on the couch and smoked the cigarette. She left the cigarette butt on the coffee table in the victim's living room.

Defendant and Green-Verret then returned to the victim's vehicle and drove to his apartment complex. Defendant exited the vehicle and entered his apartment, while Green-Verret waited in the vehicle. After waiting approximately twenty-five to thirty minutes, Green-Verret exited the vehicle and knocked on the apartment door. She testified that Defendant opened the door and acted as if he did not know who she was. Defendant asked Green-Verret, "Who are you?" At that point, Green-Verret became suspicious that Defendant had stolen the vehicle. She became upset and told Defendant she was going to drive it to the police station.

Green-Verret departed in the victim's vehicle. Defendant then called 9-1-1 and reported that someone had stolen his girlfriend's car and was driving around in it.

Instead of driving the vehicle to the police station, Green-Verret drove the car around New Iberia, Louisiana for approximately two hours. She attempted to lease the vehicle to a drug-dealer, and she ultimately abandoned the vehicle in New Iberia in an empty lot.

Other individuals also testified seeing Defendant and the victim's car on the night of the murder. Jefferson Brooks, who lived in Defendant's apartment complex, was standing outside the apartment complex around midnight on

February 24, 2008. He witnessed a white Lincoln Town car drive into the parking lot and saw Defendant exit the vehicle and enter his apartment.

Ted Darby, who lived near the empty lot where Green-Verret left the car, testified that he heard a male and female arguing outside his residence around 2:00 a.m. on the night of the murder. The following morning, he saw a white Lincoln Town car parked behind his residence that was not there when he arrived home the night before.

*Photo Identification*

After police identified and located Green-Verret, she led them to the location of the victim's vehicle. On July 21, 2010, more than two years following the victim's death, Green-Verret was shown a lineup of six different people. The officer asked whether she could identify the individual she was riding with in the car on the night of the murder. Green-Verret wavered between two individuals but ultimately settled on Defendant.

The officer who conducted the photo identification testified that it took Green-Verret approximately three to four minutes to identify Defendant. Given that the events occurred over two years prior, the officer stated that this amount of time was not unusual. The officer confirmed that, prior to showing Green-Verret the photo lineup, he informed her that he was going to "show her the gentleman that she said she was riding in the car with that night." Following Green-Verret's identification of Defendant, the officer transferred his photo from the lineup to a folder without specifically showing it to Green-Verret.

At the conclusion of the trial, the jury unanimously found Defendant guilty of second degree murder. He received a mandatory sentence of life in

prison, at hard labor, without benefit of probation, parole, or suspension of sentence.

## III.

## <u>LAW AND DISCUSSION</u>

Defendant asserts that the evidence presented at trial, which consisted solely of circumstantial evidence, was insufficient to support the jury's verdict convicting him of second degree murder, in violation of La.R.S. 14:30.1. Specifically, he argues that the jury's verdict fails to meet the standard of sufficiency of the evidence because the circumstantial evidence presented did not exclude every reasonable hypothesis of innocence.

### Standard of Review

The standard of review for sufficiency of the evidence to uphold a conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the prosecution proved all of the requisite elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781 (1979). The *Jackson* standard of review is an objective standard for testing all of the evidence, both direct and circumstantial, for reasonable doubt. *State v. Marcantel*, 00-1629 (La. 4/3/02), 815 So.2d 50. The trier of fact is presumed to have acted rationally until it appears otherwise. *State v. Mussall*, 523 So.2d 1305 (La.1988).

Under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. *Mussall*, 523 So.2d 1305. Rather, the reviewing court is required to consider the whole record and determine

whether any rational trier of fact would have found guilt beyond a reasonable doubt. *State v. Sylvia*, 01-1406 (La. 4/9/03), 845 So.2d 358.

In this case, the jury found Defendant guilty of second degree murder. Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1; *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So.2d 434. Specific intent exists when the offender's state of mind is such that he actively desires the specific consequences of the crime to follow the act. *State v. Corley*, 97-235 (La.App. 3 Cir. 10/8/97), 703 So.2d 653, *writ denied*, 97-2845 (La. 3/13/98), 712 So.2d 875.

**Discussion**

Defendant's claim that the evidence was insufficient to support conviction of second degree murder rests on two arguments. First, Defendant asserts that the State, which bore the burden of positively identifying Defendant as the perpetrator, failed to negate any reasonable probability that Defendant was misidentified. Specifically, Defendant argues that Green-Verret's identification of him was tainted by the unduly suggestive nature of the identification procedure and was reflected through Green-Verret's uncertainty throughout the process. Second, Defendant alleges that the evidence presented by the State, specifically the crime scene DNA evidence, did not negate a reasonable hypothesis of innocence that he was not the perpetrator and created a reasonable inference that someone other than him killed the victim. We find no merit in either of Defendant's arguments.

*Photo Identification*

Defendant's first argument involves the photo lineup identification procedure and the testimony of Green-Verret. Defendant asserts that the

8

identification procedure was unduly suggestive and tainted the accuracy of the identification because: (1) Green-Verret was informed by the interviewing officer prior to being shown the lineup that "he wanted to show her a picture of the gentleman she was riding around with [on the night of the murder.];" (2) the identification occurred more than two years following the crime; (3) Green-Verret wavered between two photographs, pointing first to the alternate photograph twice before identifying Defendant; (4) Green-Verret was not stopped from further consideration following identifying the alternate photograph as the perpetrator, and this indicated to her that she was not finished, as opposed to the "good" she was met with after subsequently identifying the Defendant; and (5) the suggestiveness of the identification procedure "was magnified when the officer 'transferred' [Defendant's] booking photo from one folder to another in her presence after her selection was made."

In support of his argument, Defendant relies on several legal principles pertaining to suggestive procedures that result in potential misidentification when a defendant seeks to suppress the use of the identification evidence. Specifically, Defendant quotes the language by this court in *State v. Citizen*, an unpublished opinion bearing docket number 12-58, p. 5 (La.App. 3 Cir. 10/3/12), which explained:

> An identification procedure is suggestive if it unduly focuses a witness's attention on the suspect. *State v. Neslo*, 433 So.2d 73, 78 (La.1983); *State v. Robinson*, 386 So.2d 1374, 1377 (La.1980). Strict identity of physical characteristics among the persons depicted in a photographic array is not required; however, there must be sufficient resemblance to reasonably test the identification. *State v. Smith*, 430 So.2d 31, 43 (La.1983); *State v. Guillot*, 353 So.2d 1005, 1008 (La.1977). The question for a reviewing court is to determine whether the procedure is so conducive to

9

> irreparable misidentification that due process was denied. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977); *State v. Martin*, 595 So.2d 592, 595 (La.1992); *State v. Prudholm*, 446 So.2d 729, 738 (La.1984). A defendant attempting to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. *State v. Prudholm*, 446 So.2d at 738; *State v. Chaney*, 423 So.2d 1092, 1098 (La.1982).

*State v. Bright*, 98–398, pp. 17–18 (La.4/11/00), 776 So.2d 1134, 1145, *post-conviction relief granted,* 02–2793, 03–2796 (La. 5/25/04), 875 So.2d 37.

Defendant did not object to the admission of the photo lineup identification evidence at trial and does not presently assert that the evidence of the photo lineup identification should not have been admitted. *State v. Boyance*, 05-1068 (La.App. 3 Cir. 3/1/06), 924 So.2d 437, *writ denied*, 06-1285 (La. 11/22/06), 942 So.2d 553 (the issue of the admissibility of an identification procedure is not preserved where a defendant fails to file a written motion to suppress or object at trial). Defendant instead alleges that the suggestive nature of the identification procedure affected the sufficiency of evidence presented at trial. Because Defendant has failed to preserve the issue of admissibility of the identification procedure and is, instead, arguing the weight of the evidence, an issue which is in the purview of the factfinder, a determination of whether the identification is suggestible is unnecessary.

It is well-settled that it is the role of the fact-finder to weigh the credibility of a witness. *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983). The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of a witness. *State v. Macon*, 06-481 (La. 6/1/07), 957 So.2d 1280. Therefore, an appellate

court will not reweigh the credibility of a witness on appeal and should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluation under the *Jackson* standard of review. *Id. See also*, *State v. Lambert*, 97-64 (La.App. 3 Cir. 9/30/98), 720 So.2d 724.

The jury was presented with the facts and circumstances surrounding Green-Verret's identification concerning Defendant. The jury heard testimony of the alleged suggestive nature of the remarks by the officer telling the witness that "[the Defendant] was in the lineup she would be shown" and that the officer commented that he wanted "to show her a picture of the gentleman she was riding around with."

The jury also heard Green-Verret's testimony that she had difficulty distinguishing Defendant from two different photographs and wavered in making her decision. She also testified as to her statement expressing doubt when she inquired whether she had chosen the right photograph.

Thus, notwithstanding any suggestive nature of the photo lineup procedure alleged by Defendant, the jury was afforded all of the relevant facts surrounding the circumstances of the lineup procedure. The jury was given the requisite information to properly form an opinion regarding the reliability of the identification procedure and the credibility of the testifying witnesses.

We will not disturb the jury's finding on appeal.

*Sufficiency of the Evidence*

Defendant's second argument questions the sufficiency of the evidence presented at trial to convict him of second degree murder. Specifically, Defendant focuses on the DNA evidence found at the crime scene and argues that

11

it does not foreclose the possibility that the crime was committed by another person. Defendant contends that a reasonable inference exists that "someone else entered through the unlocked front door and killed [the victim]."

Defendant argues that the DNA evidence found at the scene of the crime only proved that he could not be excluded as a source, which could have been attributed to any patrilineal related males and an unknown number of unrelated males. Defendant also contends that the reason the DNA was found on the knife in the victim's possession and the knives in her kitchen was because he was a frequent visitor at the victim's residence.

Defendant asserts that Green-Verret's testimony merely placed him at the crime scene and did not prove he actually killed the victim. Defendant also notes that a time of death was not established. Finally, Defendant argues that the crime scene was compromised because investigators failed to secure a footprint ridge and broken window glass. He argues that the compromised crime scene created a reasonable inference that someone else entered the residence and killed the victim.

The trial in the instant case lasted five days. Over the course of the trial, the jury heard testimony from twenty-two separate witnesses. Defendant's argument alleges that potential evidentiary discrepancies in isolation rendered the totality of the evidence presented to the jury insufficient. Defendant's argument fails to consider the vast amount of evidence, outside of the alleged discrepancies, that the jury considered to arrive at the verdict of second degree murder.

Upon reviewing the sufficiency of the evidence, we find that a rational trier of fact, after viewing the evidence in the light most favorable to the

prosecution, could have found beyond a reasonable doubt that Defendant was guilty of second degree murder.

## DECREE

We affirm Defendant's conviction for second degree murder.

**AFFIRMED.**