KEITH EZIDORE

VERSUS

TIMOTHY HOOPER, WARDEN

NO. 25-KH-56

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Susan S. Buchholz
Chief Deputy, Clerk of Court

July 16, 2025

Susan Buchholz
Chief Deputy Clerk

**IN RE** KEITH EZIDORE

**APPLYING FOR**  SUPERVISORY WRIT FROM THE TWENTY-THIRD JUDICIAL DISTRICT COURT, PARISH OF ST JAMES, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE STEVEN C. TUREAU, DIVISION "D", NUMBER 92,1983

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Timothy S. Marcel

**WRIT GRANTED**

In this writ application, relator, Keith Ezidore, seeks review of the trial court's November 26, 2024 ruling denying his application for post-conviction relief (APCR).  For the following reasons, we grant the relief requested, vacate relator's conviction and sentence, and remand for a new trial.

**Facts and Procedural History**

*Conviction and Sentence*

On January 14, 1991, Ralph Flowers was stabbed approximately twenty times and died of chest wounds.  Two years later, on January 21, 1993, relator and co-defendant, Larry Walker, were found guilty by a jury of second degree murder in violation of La. R.S. 14:30.1.  On June 21, 1993, the trial court sentenced relator

25-KH-56                                                     1

to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.[1]

*Appeal of Conviction and Sentence*

On January 31, 1995, this Court affirmed relator's conviction and sentence in a joint appeal with co-defendant Walker. *State v. Walker and Ezidore*, 93-632 (La. App. 5 Cir. 1/31/95), 650 So.2d 363. The Louisiana Supreme Court denied relator's writ application on June 23, 1995. *State v. Ezidore*, 95-545 (La. 6/23/95), 656 So.2d 1013.

The State's primary witness, Tory Burnett, who was fifteen years old at the time of trial, implicated relator and Walker in three statements he provided to the police. This Court's opinion summarized Burnett's testimony and statements as follows:[2]

> Burnette gave three recorded statements to police officers, on September 17, October 25 and November 4, 1991. Although there were some variations in these statements and in Burnette's trial testimony, Burnette straightforwardly said, over and over, that Walker and Ezidore went to Flowers' place of business to rob him, with Burnette acting as lookout after refusing a more active role in the crime. Ezidore, according to Burnette, grabbed and held Flowers while Walker did the fatal stabbing.
>
> Most of the variations were in regard to the nature and extent of Burnette's own involvement. He was also somewhat inconsistent in his description of Flowers' wounds and in his recall of the weapon used in the attack. Burnette said that an ice pick was used while other evidence showed a pick ax and/or a knife caused Flowers' death.

*Ezidore*, 93-632, 650 So.2d at 366.[3] On appeal, we further noted that "[t]he jury also knew that Burnette had a criminal record as a juvenile and had been promised

---

[1] Co-defendant Walker was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on February 11, 1993. *State v. Walker and Ezidore*, 93-632 (La. App. 5 Cir. 1/31/95), 650 So.2d 363, 365.

[2] Although this Court's opinion spells Tory's surname as "Burnette," the instant application spells his surname as "Burnett."

[3] Our summary of Burnett's testimony was in reference to Walker's "assignment of error that the discrepancies in Burnette's statements made his overall testimony unbelievable" as part of Walker's insufficient evidence claim. *Ezidore*, 93-632, 650 So.2d at 366. We found: "[I]n Walker's case, there was believable corroborative testimony and there was fingerprint evidence. A rational trier of fact could have found that Walker and Ezidore murdered Flowers." *Id*. at 368.

immunity in exchange for his testimony." *Id*. Specifically, the jury was aware that Burnett was in juvenile detention when he made his first statement and that he was residing in a detention center at the time of trial. The jury was also aware that the State agreed to dismiss a pending burglary charge, as well as to provide Burnett immunity from prosecution for the murder of Flowers in exchange for his testimony.

***Post-Conviction Relief Proceedings***

The procedural history of this matter also includes prior applications for post-conviction relief. With respect to relator's protracted post-conviction proceedings, the following summary is provided from our previous writ disposition in *Ezidore v. Hooper*, 23-363 (La. App. 5 Cir. 8/30/23) (unpub'd), *writ granted in part; otherwise denied*, 23-1312 (La. 5/7/24), 384 So.3d 341 (*per curiam*):

> On May 12, 1998, the relator filed an APCR, through counsel, in which he raised the following claims: (1) the State withheld favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) discrimination in the grand jury selection process; (3) denial of confrontation rights; (4) ineffective assistance of counsel; (5) *Batson* violation; and (6) newly discovered evidence. On July 12, 1999, the district court held a hearing with respect to the relator's *Brady* claim regarding the State's failure to disclose that its primary witness, Tory Burnett, was facing a charge of armed robbery in an unrelated case. The district court subsequently denied relief on October 11, 1999. On February 3, 2000, this Court denied relief, *State v. Ezidore*, 99-KH-1383 (La. App. 5 Cir. 2/3/00)(unpublished writ disposition). The Supreme Court denied the relator's writ application. *State v. Ezidore*, 00-686 (La. 9/29/00), 769 So.2d 1218.
>
> On October 4, 2004, the relator, through counsel, filed an APCR raising claims of a *Brady* violation regarding Burnett's undisclosed armed robbery charge, ineffective assistance of counsel, and a request for DNA testing in the district court. The district court subsequently granted the request for DNA testing on March 14, 2005, but the remaining claims raised in his APCR remained pending before the district court. On June 6, 2008, the relator's Motion to Compel DNA testing was granted by the district court, but the remaining claims

---

Relator raised his insufficient evidence claim as part of his assignment of error challenging the denial of his motion for a new trial. We also found: "[T]he proof against both defendants has already been discussed. All elements of second degree murder were established by sufficient testimony and evidence of whether the jury accepted the statements of state witnesses Burnette and Dewey, which apparently was the case. The jury obviously was not swayed by the defendants' alibi defense." *Id.* at 370.

25-KH-56

raised in the APCR remained pending before the district court. On May 5, 2017, the relator filed a Motion to Supplement his 2004 APCR in the district court with respect to his still-pending *Brady* claim and also requested additional DNA testing. Specifically, the relator supplemented his *Brady* claim with Burnett's juvenile criminal record, which he alleged showed that the State had failed to disclose that Burnett was promised that all of his pending charges would be *nolle prossed* in exchange for his testimony. The relator also claimed that Burnett had recanted his testimony implicating the relator. On May 23, 2017, the district court granted the relator's Motion to Supplement, stating: relator's "filing of October 4, 2004, is supplemented by his filing of May 5, 2017."

DNA testing was completed in September of 2019, and revealed that the only interpretable crime scene DNA was that of the victim. On December 27, 2022, the relator, through counsel, filed a Supplement to Application for Post-Conviction Relief with the district court. In this application, the relator supplemented his *Brady* claim with transcribed recordings of Burnett's juvenile court proceedings, which the relator alleged indicates that the State *nolle prossed* all of Burnett's pending charges in exchange for his testimony. The relator also raised a claim of factual innocence pursuant to La. C.Cr.P. art. 926.2. On May 8, 2023, the State filed its procedural objections, arguing that the relator's *Brady* and ineffective assistance of counsel claims were untimely and repetitive and that the relator's factual innocence claim failed to meet the requirements under La. C.Cr.P. art. 926.2.

On June 12, 2023, the district court held a hearing on the procedural objections raised by the State. Following argument from both sides, the district court first found that the relator's claim of factual innocence pursuant to La. C.Cr.P. art. 926.2 was not supported by the requirements of the statute. The district court also found that the relator's remaining claims, *i.e.*, *Brady* violation and counsel's ineffectiveness, contained in his original 2004 APCR and subsequent supplements in 2017 and 2022, were "somewhat repetitive and [had been] taken care of, either in the 1998 pleading or a time bar." In doing so, the district court stated that it "would grant the State's procedural objection regarding the additional claims of the 2004 petition in addition to the '17 and '22 supplements to the 2004 second filing of the post-conviction relief." Upon a request for clarification by the relator's counsel, the district court confirmed that its ruling denied "the 2004 filing as supplemented in 2017 and '22 as procedurally barred."

*Ezidore*, 23-363 (internal footnotes omitted).

On July 21, 2023, relator filed a counseled writ application with this Court, in which he re-urged his claims of a *Brady* violation and factual innocence.[4] On

---

[4]With respect to relator's factual innocence claim, this Court found "that the evidence submitted by the realtor in support of his claim of factual innocence does not meet the requirements set forth in La. C.Cr.P. art. 926.2." *See Ezidore*, 23-363.

4

review, we first found that relator's supplemental filings to his 2004 APCR, which the district court allowed, were not prescribed by La. C.Cr.P. art. 930.8, given his reliance on newly discovered evidence with respect to his *Brady* claim. *See Ezidore*, 23-363.

The newly discovered evidence included additional documentation of Burnett's juvenile records showing that he had "three extant juvenile adjudications" that were not reflected on Burnett's rap sheet turned over to the defense at trial. Specifically, those juvenile adjudications included: (1) a 1987 juvenile adjudication for "cutting someone with a bottle" when Burnett was nine years old; (2) a 1989 juvenile adjudication for possession of stolen property; and (3) a 1990 juvenile adjudication for criminal damage to property for which Burnett received three years probation.

In addition, relator submitted transcripts from Burnett's juvenile hearings during which: (1) Burnett's mother, on May 20, 1991, indicated Burnett was in need of mental health treatment; and (2) the sheriff's office requested Burnett's release on November 4, 1991, because "[t]he case he's been helping us with, the boys have been arrested." Relator also included additional documentation about Burnett's involvement in the December 29, 1991 armed robbery,[5] which relator claims showed that Burnett lied about being coerced by his adult co-perpetrator, attempted to bribe a witness in support of his claim of coercion, and was described as a "habitual liar."

According to relator, reports and witness statements regarding the armed robbery revealed that Captain Dicharry, the juvenile officer who interviewed relator about the instant offense, also interviewed several witnesses about the armed robbery "in order to try and exculpate" Burnett. Relator also included investigative reports from the St. James Parish Sheriff's Department revealing that

---

[5] As mentioned above, relator first submitted documentation regarding the armed robbery in his 1998 APCR.

5

on December 31, 1991, the day after Burnett was arrested for the armed robbery, he escaped from the detention center by breaking the glass to the line-up room.

As further support for his *Brady* claim, relator included the January 6, 1992 hearing transcript that, according to relator, shows that the State "unlawfully detained" Burnett on the pending burglary charge in order to "maximiz[e] its control" over him at the time he testified at relator's trial. Finally, relator included the March 8, 1993 transcript showing that the State *nolle prossed* all of Burnett's pending charges, including the armed robbery, not just the burglary charge as disclosed to the defense.

In reviewing the merits of relator's *Brady* claim, we first recounted the disclosures made by the State concerning Burnett, stating:

> In this case, the State filed an Amended Answer to Motion for Discovery and Bill of Particulars containing the agreement between the State and Burnett that, upon the completion of Burnett's "truthful testimony" at the relator's trial, the State would dismiss the pending burglary charge. The State further noted that there had been "no guarantee or written agreement of any kind" before January 5, 1993, but acknowledged that there had been prior discussions with Burnett and "other representatives of the State[.]" According to the State, the agreement was finalized on January 5, 1993. In addition, the State furnished Burnett's juvenile rap sheet, which included several unadjudicated offenses, to the defense. The State granted Burnett immunity from prosecution for any role in the Flowers murder. During trial, the defense agreed to the State's stipulation, which was described as follows:

> > [T]to the effect that at the time of the October statement that was given by Tory Burnett to various law enforcement officials there had been an -- an oral understanding or agreement between Tory Burnett and those representatives of the state that in exchange for his cooperation and testimony he personally would not be prosecuted for the murder of Ralph Flowers.

> > The prosecutor then included a statement indicating that "the State intends to honor that agreement and not prosecute Tory Burnett with reference to his involvement in connection with this matter."

*Ezidore*, 23-363.

25-KH-56

With regard to relator's trial, we pointed out that "defense counsel thoroughly cross-examined Burnett, making a significant attempt to discredit his testimony." Specifically, we stated:

> Burnett admitted that he was currently residing at a detention center and that he had been in a detention center for the past ten and one-half months. He also testified that he was in a detention center when he gave his first statement to the police in September of 1991. Burnett further admitted that he was "let out" on the same date that he gave his last statement to the police on November 4, 1991, and that he remained out for about three weeks. On direct examination by the State, Burnett also admitted that he "ended up" in juvenile detention on May 29, 1991. In closing argument, defense counsel argued with regard to Burnett's testimony:
>
>> Now, does he have a motive for lying? Does he have a motive to lie? This guy's got the sweetest deal that he could possibly get. We know he's going to get off robbing somebody. We later find out that he's had a deal on the murder since October of '91, but it's better than that, ladies and gentlemen. In September of 1991 this boy had been locked up for four or five months. Been locked up since almost, I think he got locked up before school got out. He gives a statement in September, he gives a statement in October, he gives a statement in November. November the 4th is the last statement, and guess when he gets let out of jail? Well, it's just a coincidence. It's certainly not a deal, but his testimony was he walked out of detention on November the 4th. Does he have a motive to lie?

*Ezidore*, 23-363.

In denying relief, we concluded: "Our review of all of the evidence submitted by the relator in support of his alleged *Brady* violation leads us to conclude that there is not a reasonable probability that the alleged evidentiary suppression of Burnett's unrelated juvenile offenses served to undermine confidence in the outcome of the relator's trial." *Ezidore*, 23-363.

We specifically made the following findings:

> Relator's *Brady* claim rests on documentation which would have been cumulative of the evidence presented at trial, as the defense and the State made the jury aware of Burnett's "criminal record as a juvenile and [that he] had been promised immunity in exchange for his testimony." *Ezidore*, 93-632, 650 So.2d at 366. "[W]hen the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs." *Spence v. Johnson*, 80 F.3d 989, 995 (5th

7

Cir. 1996), *cert. denied*, 519 U.S. 1012, 117 S.Ct. 519, 136 L.Ed.2d 407 (1996) (and cases cited). *See also United States v. Quintanilla*, 25 F.3d 694, 699 (8th Cir. 1994), *cert. denied sub nom. Torres Velasquez v. United States*, 513 U.S. 978, 115 S.Ct. 457, 130 L.Ed.2d 365 (1994) (no *Brady* violation when the prosecution does not disclose some cumulative evidence, but "substantial" other evidence on same point does reach jury). Furthermore, although the relator contends that the State *nolle prossed* not only Burnett's burglary charge as promised, but all of Burnett's pending charges, such a claim is speculative as there is no mention of any such agreement in the documents submitted with this writ application. *See* La. C.Cr.P. art. 930.2. As for the "three extant adjudications" undisclosed by the State, as a general matter, evidence of a witness's prior juvenile adjudication is not commonly admissible to attack the witness's credibility. La. C.E. art. 609.1(F). However, in *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974), the United States Supreme Court held that the State's interest in protecting the confidentiality of a juvenile offender's record was subordinate to the constitutional right of effective cross-examination for bias of an adverse witness. The writ application before us makes it clear that the jury was aware of the most compelling deal between the State and Burnett, *i.e.*, that Burnett would not face a charge of second degree murder as a principal and a life sentence in the instant case.

*Ezidore*, 23-363 (internal footnotes omitted).

Relator subsequently sought review in the Louisiana Supreme Court, which granted relator's writ in part, with three justices dissenting, but otherwise denied relief, stating:

We find that the court of appeal correctly determined that the district court erred in imposing procedural bars to dismiss applicant's post-conviction claims involving violations of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). *Ezidore v. Hooper*, 23-363 (La. App. 5 Cir. 8/30/23) (unpub'd). However, we also find that the court of appeal erred in determining from the information available that post-conviction applicant Keith Ezidore failed to show that any material suppression had occurred. Accordingly, we grant the application in part to reverse that portion of the court of appeal's ruling, and we remand to the district court with instructions to conduct an evidentiary hearing at which applicant will have the opportunity to carry his burden post-conviction, La. C.Cr.P. art. 930.2, of showing the State suppressed material evidence that was reasonably likely to have affected the judgment of the jury. *See generally Wearry v. Cain*, 577 U.S. 385, 136 S.Ct. 1002, 194 L.Ed.2d 78 (2016); *see also Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (clarifying that the rule stated in *Brady* applies to evidence undermining witness credibility).

As for applicant's recantation-based claim of factual innocence, we find that applicant has failed to present evidence that is both new and sufficiently corroborated in accordance with La. C.Cr.P. art.

926.2(B)(2), (B)(1)(a). Therefore, applicant's claim of factual innocence can properly be dismissed, see La. C.Cr.P. arts. 929, 930, and the application here with regard to the claim of factual innocence is denied.

*See Ezidore v. Hooper*, 23-1312 (La. 5/7/24), 384 So.3d 341 (*per curiam*).

*August 12, 2024 Evidentiary Hearing*

On remand from the Louisiana Supreme Court, the district court held an evidentiary hearing on August 12, 2024[6]. At the hearing, relator called five witnesses. First, Jacqueline O'Neal, an Innocence Project intern, was called to provide exhibit summaries of the documents submitted by relator.[7]

Next, relator called Richard Brazan, a former assistant district attorney who represented the State in the juvenile cases involving Burnett. At the hearing, Brazan testified that he did not know when Burnett began speaking with Captain Dicharry regarding being a witness in the instant case, and testified that he had "no reason to doubt" Captain Dicharry's previous testimony that Burnett made his first statement on September 9, 1991. Mr. Brazan then testified that the transcript from the September 9, 1991 hearing on Burnett's burglary charge stated that a continuance was granted "because we're trying to work something out." Next, Mr. Brazan reviewed the November 4, 1991 transcript showing that Burnett was released from custody at the request of the sheriff's office. According to Mr. Brazan, such a request was not "usual or unusual."

Mr. Brazan also confirmed that he made a written statement on July 3, 2024, following his review of the November 4, 1991 transcript in which he stated: "Somebody being released at the sheriff's office's request would be highly unusual." He further confirmed that his statement declared: "I do not specifically

---

[6]The evidentiary hearing was originally scheduled for July 8, 2024.

[7]The documents included relator's trial transcript, Burnett's recorded statements and the petitions, minutes, transcripts, and adjudications from Burnett's juvenile proceedings. The district court sustained the State's objection to the admission of the summaries of the documents already admitted into evidence.

9

remember this, but the only explanation that I can think of is that Mr. Burnett was released because he was cooperating with the sheriff's office."

Next, Mr. Brazan was asked about the January 6, 1992 hearing on Burnett's armed robbery charge. He confirmed that the transcript indicated that he did not present any evidence, and he could not recall why he did not present any evidence. He did recall that Burnett claimed that he was forced to commit the armed robbery. Mr. Brazan also confirmed that the record reflected that Burnett was returned to custody on the burglary case without a future hearing date scheduled. He was then asked about Burnett's treatment in custody after January 6, 1992. According to Mr. Brazan, he had heard Burnett was caught in the girl's section of the detention area and that Burnett's attorney had commented that Burnett was "pretty much running the jail." He confirmed that he agreed to Burnett's release after a discussion with Julie Cullen, the assistant attorney general, who tried the case against relator.

Finally, Mr. Brazan was asked about a March 8, 1993 hearing concerning five of Burnett's cases, including the armed robbery. He confirmed that the record reflected that "all matters have been dismissed" and testified that he only had the authority to dismiss charges that were pending. He could not explain why any completed charges were dismissed. He further stated that he remembered that the charges were dismissed because Burnett had testified at relator's trial.

On cross-examination by the State, Mr. Brazan testified that he did not recall discussing "dismissing any or all of the juvenile matters" with Ms. Cullen. He also stated that "from a legal standpoint, if a case was completed, there was no way I could *nolle prosequi* it."

Relator's next witness, Kiah Howard, the senior staff investigator for the Innocence Project, testified that when he met with Burnett on June 15, 2024, Burnett indicated his willingness to testify at the July 8, 2024 evidentiary hearing,

25-KH-56

however, Burnett also expressed concern that Captain Dicharry, Burnett's former juvenile officer, would also be present at the hearing, and that he would mess with him. Mr. Howard then testified that Captain Dicharry approached Burnett before the July 8, 2024 evidentiary hearing and advised him to change his clothes because he was improperly dressed for the courthouse. According to Mr. Howard, Burnett told him that Captain Dicharry had been "mess[ing]" with him and that he no longer wanted to testify. Burnett left the courthouse before the hearing.

Next, relator called Captain Brent Dicharry of the St. James Parish Sheriff's Office, who testified that he was a juvenile officer in 1991. He first interviewed Burnett about the instant case on September 9, 1991, but related that he had known Burnett and his family for "a while." He admitted that he took Burnett into custody for a burglary charge on May 17, 1991, and appeared at the subsequent 72-hour hearing for the burglary charge on May 20, 1991. He also confirmed that he had been handling Burnett's vandalism case as of May 20, 1991. Although he could not recall if Burnett was on probation at the time of the burglary charge, he admitted that the court records reflected Burnett's probationary status at that time. He then confirmed that the court records showed that Burnett's adjudication hearing for the burglary charge was set for September 9, 1991, the same day Burnett gave his first statement about the instant case, and that he did not know why the hearing was postponed on that day. Captain Dicharry testified that Burnett was released from custody on November 4, 1991, the date of his third statement, at the request of the sheriff's office, but maintained that he did not make the request, although he was the only member of the sheriff's office present at the hearing.

According to Captain Dicharry, after Burnett's release on November 4, 1991, he learned of Burnett's involvement in an armed robbery with a knife, and took him into custody on December 30, 1991. He also confirmed that Burnett had

escaped from the visitor's center on December 31, 1991, by throwing a chair and breaking glass. However, he had no explanation for why Burnett was not charged with any crimes related to his escape and the damage to property. Captain Dicharry also admitted that during his trial testimony, he did not mention the armed robbery charge or Burnett's escape, but testified that Burnett was detained for a burglary and that Burnett later "left on his own."

On cross-examination, Captain Dicharry testified that he never instructed Mr. Brazan to dismiss any juvenile matters involving Burnett, nor did he recall Ms. Cullen instructing anyone to do so. He denied promising Burnett anything for his first statement made on September 9, 1991. He indicated that he interviewed Burnett on September 9, 1991, based on a complaint that Burnett harassed a classmate by telling him that his father was going to jail for a murder. The classmate was relator's son.

Relator's final witness was William Grimley, relator's trial counsel. Mr. Gimley testified that the State disclosed its agreement to drop Burnett's burglary charge in exchange for his trial testimony to the defense on January 8, 1993, the week before the trial. He emphasized that, at this time, he was told of one and only deal-the burglary deal. He testified that later, in the middle of trial, the State disclosed that Burnett had been granted immunity prosecution for the murder of Mr. Flowers. He also stated that during trial, Burnett's rap sheet was discussed. The trial judge ruled that Burnett's juvenile arrests would not be admissible, but that juvenile adjudications could be used for impeachment purposes.

The State called one witness, Julie Cullen, the former assistant attorney general who prosecuted the case against relator and his co-defendant. According to Ms. Cullen, aside from the burglary charge, she was unaware of any other pending charges Burnett faced at the time of trial. Ms. Cullen also verified that the

25-KH-56

agreement with Burnett only concerned the dismissal of the pending burglary charge and immunity from prosecution for murder.

At the conclusion of the evidentiary hearing, the district court ordered both sides to submit post-hearing memorandums.

*Post-Hearing Memoranda*

On October 11, 2024, relator filed his post-hearing memorandum. In it, relator argued that Burnett's undisclosed probationary status at the time he made his first statement on September 9, 1991, was a "material *Brady* violation" given its value as impeachment evidence. Relator also pointed out that Burnett's rap sheet turned over by the State failed to show that Burnett had three juvenile adjudications that could have been used for impeachment purposes in light of the trial judge's ruling to that effect. In addition, relator argued that following Burnett's release after his third statement on November 4, 1991, he was charged with armed robbery that was *nolle prossed* after relator's trial and was not charged with other criminal acts based on his escape from detention thereby suggesting that Burnett received additional undisclosed benefits from his cooperation in the instant case.

The State also filed its post-hearing memorandum on October 11, 2024, arguing that relator's allegations of undisclosed benefits provided to Burnett were speculative. With respect to any additional undisclosed records of Burnett's criminal history, the State maintained that such evidence would have been cumulative, and potentially inadmissible.

*District Court Ruling: November 26, 2024*

On November 26, 2024, the district court denied relator's APCR, first finding "that any alleged undisclosed juvenile records would have been cumulative of the substantial evidence already presented at trial regarding Burnett's background, detention history, and agreement with the State." Specifically, the

13

district court found that "the jury was informed that Burnett had a juvenile record, that he was detained at the time of his statements to police, and that he was released thereafter. The jury also knew that Burnett had an immunity agreement in exchange for his testimony." As such, the district court found that "the undisclosed records do not meet the threshold for materiality under *Brady v. Maryland*, 373 U.S. 83 (1963), as they are merely cumulative (see also *United States v. Quintanilla*, 25 F.3d 694, 699 (8th Cir. 1994))." The district court then concluded, "Petitioner's *Brady* claim fails as he has not demonstrated that the alleged withheld evidence would have affected the jury's verdict. The evidence presented at trial encompassed the pertinent aspects of Burnett's background and cooperation agreement, fulfilling the requirements for a fair trial."

Relator timely filed a counseled writ application with this Court. In his writ application, relator's counsel maintains that the district court "err[ed] in finding the State's suppression of favorable evidence was immaterial."

**Analysis**

In *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-97, the U. S. Supreme Court held that the suppression by the State of evidence favorable to the accused after receiving a request for it violates a defendant's due process rights where the evidence is material to either guilt or punishment, without regard to the good or bad faith of the prosecutors. *See also State v. Bright*, 02-2793 (La. 5/25/04), 875 So.2d 37, 41-42. The duty to disclose is applicable even where there has been no request by the accused. *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). The State's due process duty to disclose applies to both exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *State v. Kemp* 00-2228 (La. 10/15/02), 828 So.2d 540, 545. *Brady* also requires the disclosure of evidence concerning a promise of leniency or immunity to a material witness in exchange

14

for his testimony at trial. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Evidence is "material" under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. A reviewing court determining materiality must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

Here, the State's Amended Answer to Motion for Discovery and Bill of Particulars, filed January 8, 1993, contained the agreement between the State and Burnett that upon the completion of Burnett's "truthful testimony" at relator's trial, the State would dismiss the pending burglary charge. The State further indicated that there had been "no guarantee or written agreement of any kind" before January 5, 1993, but acknowledged that there had been prior discussions with Burnett and "other representatives of the State[.]" According to the State, the agreement was finalized on January 5, 1993, approximately a week before trial commenced. In addition, the State furnished Burnett's juvenile rap sheet to the defense which included several unadjudicated offenses.

During the State's direct examination of Burnett, a bench conference was held where the prosecutor also revealed that the State had granted Burnett immunity from prosecution for any role in the instant offense. The defense subsequently agreed to the State's stipulation, which was described as follows:

> [T]to the effect that at the time of the October statement that was given by Tory Burnett to various law enforcement officials there had been an -- an oral understanding or agreement between Tory Burnett and those representatives of the state that in exchange for his

15

cooperation and testimony he personally would not be prosecuted for the murder of Ralph Flowers.

The prosecutor then included a statement indicating that "the State intends to honor that agreement and not prosecute Tory Burnett with reference to his involvement in connection with this matter."

During the defense's opening statement, counsel reiterated that Burnett was not "just going to get off on a burglary," emphasizing that "[h]e is the only person on the face of the earth who has confessed to the murder of Ralph Flowers and he has not been charged with that crime." A review of the trial transcript also shows that counsel made a significant attempt to discredit Burnett's testimony on cross-examination. Specifically, Burnett admitted that he was currently residing at a detention center and that he had been in a detention center for the past ten and one-half months. He also testified that he was in a detention center when he gave his first statement to the police in September 1991. Burnett further admitted that he was "let out" on the same date that he gave his last statement to the police on November 4, 1991, and that he remained out for about three weeks.

On direct examination by the State, Burnett also admitted that he "ended up" in juvenile detention on May 29, 1991. Finally, in closing argument, defense counsel asserted:

> Now, does he have a motive for lying? Does he have a motive to lie? This guy's got the sweetest deal that he could possibly get. We know he's going to get off robbing somebody. We later find out that he's had a deal on the murder since October of '91, but it's better than that, ladies and gentlemen. In September of 1991 this boy had been locked up for four or five months. Been locked up since almost, I think he got locked up before school got out. He gives a statement in September, he gives a statement in October, he gives a statement in November. November the 4th is the last statement, and guess when he gets let out of jail? Well, it's just a coincidence. It's certainly not a deal, but his testimony was he walked out of detention on November the 4th. Does he have a motive to lie?

In denying relator's *Brady* claim, the district court found:

The evidentiary record indicates that Petitioner's counsel had ample

16

opportunity to cross-examine Burnett on his juvenile history and cooperation agreement. The Court agrees with the State's position that the disclosed evidence was robust, providing the defense with sufficient grounds to challenge Burnett's credibility. The record reveals no reasonable probability that the outcome would have been different if these additional records had been disclosed.

However, in relator's view, the "non-disclosure of impeachment evidence of a star witness cannot be dismissed as immaterial because the witness was also impeached at trial." As support for his claim, relator relies on *Wearry v. Cain*, 577 U.S. 385, 136 S.Ct. 1002, 194 L.Ed.2d 78 (2016), in which the U. S. Supreme Court held that the State's failure to disclose material evidence, including police records casting doubt on the credibility of the State's star witness, violated the defendant's due process rights.

In *Wearry*, Sam Scott, an inmate, contacted the police and implicated the defendant in a murder that occurred two years earlier. *Id.*, 577 U.S. at 386, 136 S.Ct. at 1003. Scott's original statement changed substantially over the course of four statements. *Id.*, 577 U.S. at 387, 136 S.Ct. at 1003. The prosecution also called Eric Brown who corroborated Scott's testimony, stating that he saw the defendant with a man who looked like the victim. During its opening statement and closing argument, the State claimed that Brown, who was incarcerated on unrelated charges, never asked for favorable treatment nor had he received a deal. *Id*. The defendant relied on an alibi defense. *Id.*, 577 U.S. at 388, 136 S.Ct. at 1003.

On post-conviction, the defendant asserted that the State failed to disclose police records revealing statements made by Scott's fellow inmates suggesting that Scott had a personal vendetta against the defendant and that Scott had coached an inmate to lie about the defendant's involvement in the murder. In addition, the defendant claimed that the State failed to disclose that Brown unsuccessfully attempted to secure a deal with the prosecution before he testified. *Id.*, 577 U.S. at 388-89, 136 S.Ct. at 1004.

17

The Supreme Court, in finding that the "newly revealed evidence suffic[ed] to undermine confidence" in the defendant's conviction, described the State's case as "a house of cards built on the jury crediting Scott's account[,]" rather than the defendant's alibi. *Id.*, 577 U.S. at 392-93, 136 S.Ct. at 1006. In doing so, the Supreme Court cited *United States v. Agurs,* 427 U.S. 97 at 113, 96 S.Ct. at 2401, for its proposition: "[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." The Supreme Court further concluded that "Scott's credibility, already impugned by his many inconsistent stories, would have been further diminished had the jury learned" of the undisclosed statements. *Wearry*, 577 U.S. at 393, 136 S.Ct. at 1006.

As discussed above, in this case, the jury was aware that Burnett was in detention when he made his first statement and during the trial.[8] However, because the juvenile rap sheet was not a true and accurate record of Burnett's history, neither the judge, defense counsel, nor the jury were aware of his three prior adjudications and probationary status during the investigation and trial of this cause. The accuracy of information in rap sheet was clearly relied upon by the defense and the court, with the prosecutor affirmatively citing the document as the extent of Burnett's juvenile record in a bench conference as evidence that he had no other adjudications than what was contained therein. [9] Further, the State failed

---

[8] The prosecutor's opening statement also revealed to the jury that Burnett was "in trouble" when he made his first statement that "has nothing whatsoever to do with this murder."

[9] During the same bench conference concerning Burnett's rap sheet, the trial court had ruled: "My view that is adjudication is tantamount to a conviction for an adult, and I would permit questions about adjudication." As a general matter, evidence of a witness's prior juvenile adjudication is not commonly admissible to attack the witness's credibility. *See* La. C.E. art. 609.1(F). However, in *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974), the U. S. Supreme Court held that the State's interest in protecting the confidentiality of a juvenile offender's record was subordinate to the constitutional right of effective cross-examination for bias of an adverse witness. *Davis* also "stands for the proposition that the Sixth Amendment's right to confrontation of witnesses requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecuting witness by cross-examination directed at possible bias arising from the witness' probationary status as a juvenile delinquent." *See State v. Daniel*, 78 So.2d 1361,1368 (La. 1979).

18

25-KH-56

to disclose that Burnett was on probation and subject to a three-year suspended custodial disposition following his 1990 adjudication for criminal damage to property.

In *State v. Bright*, 02-2793 (La. 5/25/04), 875 So.2d 37, 43, the State withheld the criminal history of Freddie Thompson, the prosecution's key witness who had a prior conviction and was on parole at the time of the offense and during his identification of the defendant. The Louisiana Supreme Court pointed out that the fact that Thompson was under parole supervision at the time of the offense "and could have been subject to parole revocation for violation of the terms of his parole (by drinking, as he admitted doing), gave him the motivation to cooperate with law-enforcement authorities, motivation defendant had a right to reveal to the jurors." *Id*. (internal footnote omitted). The supreme court further found that "the importance of such information can be heightened in a case such as defendant's, where only one witness—the felon whose record the State suppressed—identified defendant. The only evidence relied on to convict defendant was Thompson's testimony; there were no other witnesses, and there was absolutely no physical evidence." *Id*.

In the instant case, Captain Dicharry testified that Burnett's first statement was made without "any deals, or plea bargains or made to him[.]" Captain Dicharry again testified that no deals or promises had been made at his second meeting with Burnett. Additionally, Captain Dicharry testified that he had not promised to get Burnett "out of any problems that he might be experiencing himself." The State capitalized on Captain Dicharry's testimony during its closing argument, stating that Burnett implicated relator "from the very get-go before any insinuation of deals or pleas or arrangements were made."

Nevertheless, the fact that Burnett was on probation with a pending burglary charge when he made his first statement is similar to the *Bright* scenario where the

State's withholding of the key witness' parole status prevented the defense from exploring the motivation of the witness to cooperate with law enforcement. As relator points out, on September 9, 1991, Burnett not only made his first statement implicating relator, but unbeknownst to the defense, Burnett's pending burglary case was also continued on that date, following the State's request for a recess "because we're trying to work something out."

During Burnett's cross-examination, Burnett admitted that he was released on November 4, 1991, the date of his last statement, and that he remained out for two to three weeks. In the defense's closing argument, counsel contended: "November the 4th is the last statement, and guess when he gets let out of jail? Well, it's just a coincidence. It's certainly not a deal, but his testimony was he walked out of detention on November the 4th."

Relator maintains that Burnett could have been further impeached by "showing his incentives to please the State" based on Burnett's undisclosed pending armed robbery charge and Burnett's escape from a detention center following his November 4, 1991 statement. A few weeks before relator's trial, Burnett was arrested for an armed robbery in which he claimed that his participation was coerced by his co-perpetrator. While in pre-adjudication custody on that charge, Burnett escaped from the detention center by breaking a glass window in the line-up room. Burnett, who turned himself in a few days after his escape, was never charged with any offenses related to that incident.

On January 6, 1992, a 72-hour hearing was held on Burnett's armed robbery charge, but the State declined to introduce any evidence and Burnett was released from custody on that charge. However, at the same hearing with respect to his pending burglary charge, Detective Dicharry testified that Burnett should be returned to custody "for his own protection as well as the protection of the public at large."

25-KH-56

Despite the existence of an investigative report, witness statements about the armed robbery, and the January 6, 1992 hearing transcript, no documentation of events that transpired after Burnet made his November 4, 1991 statement were turned over to the defense. On March 8, 1993, after relator's trial, Burnett's pending burglary charge was *nolle prossed* by the State as promised. In addition, the State also *nolle prossed* his pending armed robbery charge.

"[T]he Supreme Court has never limited a *Brady* violation to cases where the facts demonstrate that the state and the witness have reached a bona fide, enforceable deal." *See LaCaze v. Warden Louisiana Corr. Inst. for Women*, 645 F.3d 728, 735 (5th Cir. 2011). The Fifth Circuit further stated:

> In *Napue v. Illinois,* 360 U.S. 264, 270, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Supreme Court explained that the key question is not whether the prosecutor and the witness entered into an effective agreement, but whether the witness "might have believed that [the state] was in a position to implement ... any promise of consideration." *Id.; see Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Tassin v. Cain,* 517 F.3d 770, 778 (5th Cir. 2008) ("A promise is unnecessary."). In fact, "evidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility." *Giglio,* 405 U.S. at 155, 92 S.Ct. 763. The question is "the extent to which the testimony misled the jury, not whether the promise was indeed a promise ..." *Tassin,* 517 F.3d at 778 (citing *Napue,* 360 U.S. at 270, 79 S.Ct. 1173).

*LaCaze*, 645 F.3d at 735. Furthermore, in *State v. Sparks*, 88-17 (La. 5/11/11), 68 So.3d 435, 485-86, the supreme court held:

> [T]o the extent exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination, a witness's "hope of knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." *State v. Brady,* 381 So.2d 819, 822 (La.1980) (collecting cases); *State v. Vale,* 95–577, p. 4 (La. 1/26/96), 666 So.2d 1070, 1072. A witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the State regarding his conduct. *Vale,* 666 So.2d at 1072; *State v. Nash,* 475 So.2d 752, 755-756 (La.1985); *see also State v. Bailey,* 367 So.2d 368, 371 (La.1979) (When circumstances indicated the witness might have received the impression that testimony favorable to the State would result in dropping of charges against him, defendant was entitled to new trial where information was not revealed.)

25-KH-56

When Detective Dicharry was cross-examined regarding the circumstances of Burnett's release after September 1991, he responded: "I'm not sure how he was released. I don't know if he didn't leave on his own or was he released. I'm not sure. I know there's an incident where he left from here and just left on his own without being released." Burnett testified on cross-examination that after his release on November 4, 1991, he stayed out for about "two or three weeks."

In this case, without the knowledge of his arrest for armed robbery, his subsequent escape from detention without legal consequence, all while he was on probation and subject to a three-year suspended custodial disposition, several avenues of impeachment were foreclosed with respect to Burnett's credibility. As such, we find the State's non-disclosure precluded the defense from pursuing the cross-examination set out in *Sparks*, 68 So.3d at 485-86, with respect to Burnett's continued motivation in cooperating with the State.

At the evidentiary hearing, Ms. Cullen denied any knowledge of Burnett's pending armed robbery charge. However, "*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." *Youngblood v. West Virginia*, 547 U.S. 867, 869-870, 126 S.Ct. 2188, 2190, 165 L.Ed.2d 269 (2006) (*per curiam*) (internal quotation marks omitted). *See also Kyles*, 514 U.S. at 437, 15 S.Ct. at 1567, holding that the *Brady* rule includes evidence known only to police investigators and an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." "[W]hen the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs." *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996), *cert. denied*, 519 U.S. 1012, 117 S.Ct. 519, 136 L.Ed.2d 407 (1996) (and cases cited). *See also United States v. Quintanilla*, 25

25-KH-56

F.3d 694, 699 (8th Cir. 1994), *cert. denied sub nom. Torres Velasquez v. United States*, 513 U.S. 978, 115 S.Ct. 457, 130 L.Ed.2d 365 (1994) (no *Brady* violation when the prosecution does not disclose some cumulative evidence, but "substantial" other evidence on same point does reach jury).

In this case, the district court found "that any alleged undisclosed juvenile records would have been cumulative of the substantial evidence already presented at trial regarding Burnett's background, detention history, and agreement with the State." However, relator makes a compelling showing, in line with *Weary*, that the additional undisclosed evidence would not merely be cumulative, but would serve to compound the defense's attack on Burnett's credibility. The information withheld by the State in this case was critical information about its primary witness. The fact that the defense was able to question Burnett's credibility at trial does not bar a finding of materiality under *Brady* with respect to the undisclosed impeachment evidence. Because the suppressed evidence undermines the testimony of the prosecution's star witness— the only witness to identify relator in a case in which there was no physical evidence linking relator to the murder— relator has met his burden of showing that the undisclosed evidence rises to the materiality threshold. *See Bright*, 875 So. 2d at 43–44 ("When the State's case hinges on the testimony of one eyewitness, the *Brady* violation looms larger.").

Based on our review of the record, the inaccuracy and incompleteness of the State's pre-trial *Giglio* disclosure denied relator's attorney the opportunity to effectively cross-examine Burnett. The juvenile rap sheet provided to the defense on January 5, 1993 was not an accurate record of Burnett's juvenile history. It did not reflect nor did the State disclose two prior juvenile adjudications, his probationary status throughout the investigation and trial concerning Mr. Flowers' homicide or the pending armed robbery charge against Barnett at the time of trial. The production of an inaccurate juvenile record misdirected the defense's avenues

23

of impeachment.  It also limited the defense's ability to show that Burnett might have received additional benefits for cooperating with the State beyond immunity for the homicide and an agreement to dismiss his burglary charge.   We find this evidence to be compounding, not cumulative, and creating  a reasonable probability that the result of the proceeding would have been different had it been disclosed to the defense, which undermines our confidence in the jury verdict.

The non-disclosure of impeachment evidence of a star witness by omission and commission cannot be dismissed as cumulative and immaterial in this case. When the State's entire case relies on the credibility of a single witness, denying the defense the opportunity for effectively impeaching that witness is critical, and suppression of that impeachment evidence regarding that witness may call for a new trial.  *Smith v. Cain*, 565 U.S. 73, 76, 132 S. Ct. 627, 181 L. Ed. 2d 571 (2012); *State v. Kemp*, 00-2228, (La. 10/15/02), 828 So.2d 540, 545 ("Given appropriate circumstances," inability to impeach a single witness "can call for a new trial.").

For the foregoing reasons, we find the trial court erred when it found that the non-disclosed evidence was immaterial under *Brady*.  Accordingly, we grant the relief requested in the instant writ application and vacate relator's conviction and sentence, and remand for a new trial.

Gretna, Louisiana, this 16th day of July, 2025.

**TSM**
**FHW**

24

25-KH-56

KEITH EZIDORE

VERSUS

TIMOTHY HOOPER, WARDEN

NO. 25-KH-56

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

**CHEHARDY, C.J., DISSENTS WITH REASONS**

I respectfully dissent. As the majority's disposition discusses, when this Court affirmed relator's conviction and sentence on appeal, we noted that the jury was made aware of the State's concessions to its premier witness, Tory Burnett, whom counsel for the defense thoroughly cross examined. The jury learned that Burnett resided in juvenile detention at the time of trial; that the State agreed to dismiss Burnett's pending burglary charge; and that the State had granted Burnett immunity from prosecution for Flowers' murder in exchange for his testimony. This Court further stated: "All elements of second-degree murder were established by sufficient testimony and evidence if the jury accepted the statements of state witnesses Burnett and Dewey, which apparently was the case." *State v. Walker and Ezidore*, 93-632 (La. App. 5 Cir. 1/31/95), 650 So.2d 363, 370, *writ denied*, *State v. Ezidore*, 95-545 (La. 6/23/95), 656 So.2d 1013.

There was no testimony at trial to indicate that Burnett was not, in fact, at the scene of the murder or that Burnett's testimony was insufficient to relay to the jury the circumstances surrounding the offense or relator's role in the fatal stabbing of Flowers. The evidence at trial established:

> Burnette gave three recorded statements to police officers, on September 17, October 25 and November 4, 1991. Although there were some variations in these statements and in Burnette's trial testimony, Burnette straightforwardly said, over and over, that Walker and Ezidore went to Flowers' place of business to rob him, with Burnette acting as lookout after refusing a more active role in the crime. Ezidore, according to Burnette, grabbed and held Flowers while Walker did the fatal stabbing.

> Most of the variations were in regard to the nature and extent of Burnette's own involvement. He was also somewhat inconsistent in his description of Flowers' wounds and in his recall of the weapon used in the attack.

*Id.* at 366.

In criminal prosecutions, state witnesses rarely hold nine-to-five jobs or sing in church choirs, but their testimony nonetheless can be convincing. It is not the function of the appellate courts to reassess a witness's credibility. *State v. Matthews,* 450 So.2d 644, 647 (La. 1984).

In my view, the additional evidence to which relator points is merely cumulative and does not constitute the suppression of material evidence that was reasonably likely to have affected the judgment of the jury. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Again, the jury accepted as true Burnett's description of events leading up to the murder, as well as his consistent testimony that Walker and Ezidore killed Flowers. For these reasons, I would deny relator's writ application.

**SMC**

25-KH-56

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES



FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. TRAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS DAY **07/16/2025** TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**25-KH-56**

### E-NOTIFIED
23rd Judicial District Court (Clerk)
Honorable Steven C. Tureau (DISTRICT JUDGE)
Richard M. A. Davis (Relator)
Elena Malik (Relator)
J. Taylor Gray (Respondent)
Arielle S. Anderson (Respondent)
Irena Zajickova (Respondent)

### MAILED
Michele Farquhar  (Respondent)
Sam H. Zwingli  (Respondent)
Tianyu (John) Dong  (Respondent)
Jordyn Johnson  (Respondent)
Surya Swaroop  (Respondent)
Attorney at Law
Hogan Lovells US LLP
555 13th Street, North West
Washington, DC 20004